*191 Mr. Justice Brennan
delivered the opinion of the Court.
Under § 8 (b)(4)(ii)(B) of the National Labor Relations Act, as amended,[1] it is an unfair labor practice for a union “to threaten, coerce, or restrain any person,” with the object of “forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer ... or to cease doing business with any other person . . . .” A proviso excepts, however, “publicity, other than picketing, for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.” (Italics supplied.) The question in this case is whether the respondent unions violated this section when they limited their secondary picketing of retail stores to an appeal to the customers of the stores not to buy the products of certain firms against which one of the respondents was on strike.
Respondent Local 760 called a strike against fruit packers and warehousemen doing business in Yakima, Washington.[2] The struck firms sold Washington State *192 apples to the Safeway chain of retail stores in and about Seattle, Washington. Local 760,' aided by respondent Joint Council, instituted a consumer boycott against the apples in support of the strike. They placed pickets who walked back and forth before the customers’ entrances of 46 Safeway stores in Seattle. The pickets — two at each of 45 stores and three at the 46th store — wore placards and distributed handbills which appealed to Safeway customers, and to the public generally, to refrain from buying Washington State apples, which were only one of numerous food products sold in the stores.[3] *193 Before the pickets appeared at any store, a letter was delivered to the store manager informing him that the picketing was only an appeal to his customers not to buy Washington State apples, and that the pickets were being expressly instructed “to patrol peacefully in front of the consumer entrances of the store, to stay away from the delivery entrances and not to interfere with the work of your employees, or with deliveries to or pickups from your store.” A copy of written instructions to the pickets— which included the explicit statement that “you are also forbidden to request that the customers not patronize the store” — was enclosed with the letter.[4] Since it was desired to assure Safeway employees that they were not to cease work, and to avoid any interference with pickups or deliveries, the pickets appeared after the stores opened for business and departed before the stores closed. At all times during the picketing, the store employees continued to work, and no deliveries or pickups were obstructed. Washington State apples were handled in normal course by both Safeway employees and the employees of other employers involved. Ingress and egress by customers and others was not interfered with in any manner.
A complaint issued on charges that this conduct violated § 8 (b) (4) as amended.[5] The case was submitted directly to the National Labor Relations Board on a stipulation of facts and the waiver of a hearing and proceedings before a Trial Examiner. The Board held, following *194 its construction of the statute in Upholsterers Frame & Bedding Workers Twin City Local No. 61,132 N. L. R. B. 40, that “by literal wording of the proviso [to Section 8 (b) (4)] as well as through the interpretive gloss placed thereon by its drafters, consumer picketing in front of a secondary establishment is prohibited.” 132 N. L. R. B. 1172, 1177.[6] Upon respondents’ petition for review and the Board’s cross-petition for enforcement, the Court of Appeals for the District of Columbia Circuit set aside the Board’s order and remanded. The court rejected the Board’s construction and held that the statutory requirement of a showing that respondents’ conduct would “threaten, coerce, or restrain” Safeway could only be satisfied by affirmative proof that a substantial economic impact on Safeway had occurred, or was likely to occur as a result of the conduct. Under the remand the Board was left “free to reopen the record to receive evidence upon the issue whether Safeway was in fact threatened, coerced, or restrained.” 113 U. S. App. D. C. 356, 363, 308 F. 2d 311, 318. We granted certiorari, 374 U. S. 804.
The Board’s reading of the statute — that the legislative history and the phrase “other than picketing” in the proviso reveal a congressional purpose to outlaw all picketing directed at customers at a secondary site — necessarily rested on the finding that Congress determined that such picketing always threatens, coerces or restrains the secondary employer. We therefore have a special responsibility to examine the legislative history for confirmation that Congress made that determination. Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. “In the sensitive area of peaceful picketing Congress has *195 dealt explicitly with isolated evils which experience has established flow from such picketing.” Labor Board v. Drivers Local Union, 362 U. S. 274, 284. We have recognized this congressional practice and have not ascribed to Congress a purpose to outlaw peaceful picketing unless “there is the clearest indication in the legislative history,” ibid., that Congress intended to do so as regards the particular ends of the picketing under review. Both the congressional policy and our adherence to this principle of interpretation reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment.
We have examined the legislative history of the amendments to § 8 (b)(4), and conclude that it does not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites, and, particularly, any concern with peaceful picketing when it is limited, as here, to persuading Safeway customers not to buy Washington State apples when they traded in the Safeway stores. All that the legislative history shows in the way of an “isolated evil” believed to require proscription of peaceful consumer picketing at secondary sites, was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. .This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union’s appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer’s goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public’s assistance in *196 forcing the secondary employer to cooperate with the union in its primary dispute.[7] This is not to say that this distinction was expressly alluded to in the debates. It is to say, however, that the consumer picketing carried on in this case is not attended by the abuses at which the statute was directed.
The story of the 1959 amendments, which we have detailed at greater length in our opinion filed today in Labor Board v. Servette, Inc., ante, p. 46, begins with the original § 8 (b)(4) of the National Labor Relations Act. Its prohibition, in pertinent part, was confined to the inducing or encouraging of “the employees of any employer to engage in, a strike or a concerted refusal . . . to . . . handle . . . any goods . . .” of a primary employer. This proved to be inept language. Three major loopholes were revealed. Since only inducement of “employees” was proscribed, direct inducement of a supervisor or the secondary employer by threats of labor trouble was not prohibited. Since only a “strike or a concerted refusal” was prohibited, pressure upon a single employee was not forbidden. Finally, railroads, airlines *197 and municipalities were not “employers” under the Act and therefore inducement or encouragement of their employees was not unlawful.
When major labor relations legislation was being considered in 1958, the closing of these loopholes was important to the House and to some members of the Senate. But the prevailing Senate sentiment favored new legislation primarily concerned with the redress of other abuses, and neither the Kennedy-Ives bill, which failed of passage in the House in the Eighty-fifth Congress, nor the Kennedy-Ervin bill, adopted by the Senate in the Eighty-sixth Congress, included any revision of § 8(b) (4). Proposed amendments of § 8 (b)(4) offered by several Senators to fill the three loopholes were rejected. The Administration introduced such a bill, and it was supported by Senators Dirksen and Goldwater.[8] Senator Goldwater, an insistent proponent of stiff boycott curbs, also proposed his own amendments.[9] We think it is especially significant that neither Senator, nor the Secretary of Labor in testifying in support of the Administration’s bill, referred to consumer picketing as making the amendments necessary.[10] Senator McClellan, who also *198 offered a bill to curb boycotts, mentioned consumer picketing but only such as was “pressure in the form of dissuading customers from dealing with secondary employers.”[11] (Emphasis supplied.) It was the opponents of the amendments who, in expressing fear of their sweep, suggested that they might proscribe consumer picketing. Senator Humphrey first sounded the warning early in April.[12] Many months later, when the Conference bill was before the Senate, Senator Morse, a conferee, would not support the Conference bill on the express ground that it prohibited consumer picketing.[13] But we have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. “The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt.” Schwegmann Bros. v. Calvert Distillers Corp., 341 U. S. 384, 394-395; see also Mastro Plastics Corp. v. Labor Board, 350 U. S. 270, 288; United States v. Calamaro, 354 U. S. 351, n. 9, at 358. The silence of the sponsors of amendments is pregnant with significance *199 since they must have been aware that consumer picketing as such had been held to be outside the reach of § 8 (b)(4).[14] We are faithful to our practice of respecting the congressional policy of legislating only against clearly identified abuses of peaceful picketing when we conclude that the Senate neither specified the kind of picketing here involved as an abuse, nor indicated any intention of banning all consumer picketing.
The House history is similarly beclouded, but what appears confirms our conclusion. From the outset the House legislation included provisions concerning secondary boycotts. The Landrum-Griffin bill,[15] which was ultimately passed by the House, embodied the Eisenhower Administration’s proposals as to secondary boycotts. The initial statement of Congressman Griffin in introducing the bill which bears his name, contains no reference to consumer picketing in the list of abuses which he thought required the secondary boycott amendments.[16] Later in the House debates he did discuss consumer picketing, but only in the context of its abuse when directed against shutting off the patronage of a secondary employer.
In the debates before passage of the House bill he stated that the amendments applied to consumer picketing of customer entrances to retail stores selling goods manufactured by a concern under strike, if the picketing *200 were designed to “coerce or to restrain the employer of [the] second establishment, to get him not to do business with the manufacturer . . . ,” and further that, “of course, this bill and any other bill is limited by the constitutional right of free speech. If the purpose of the picketing is to coerce the retailer not to do business with the manufacturer” — then such a boycott could be stopped.[17] (Italics supplied.)
The relevant changes in former § 8 (b)(4) made by the House bill substituted “any individual employed by any person” for the Taft-Hartley wording, “the employees of any employer,” deleted the requirement of a “concerted” refusal, and made it an unfair labor practice “to threaten, coerce, or restrain any person” where an object thereof was an end forbidden by the statute, e. g., forcing or requiring a secondary employer to cease handling the products of, or doing business with, a primary employer. There is thus nothing in the legislative history prior to the convening of the Conference Committee which shows any congressional concern with consumer picketing beyond that with the “isolated evil” of its use to cut off the business of a secondary employer as a means of forcing him to stop doing business with the primary employer. When Congress meant to bar picketing per se, it made its meaning clear; for example, § 8 (b)(7) makes it an unfair labor practice, “to picket or cause to be picketed . . . any employer . . . .” In contrast, the prohibition of § 8 (b) (4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise.
*201 Senator Kennedy presided over the Conference Committee. He and Congressman Thompson prepared a joint analysis of the Senate and House bills. This analysis pointed up the First Amendment implications of the broad language in the House revisions of § 8 (b) (4) stating,
“The prohibition [of the House bill] reaches not only picketing but leaflets, radio broadcasts and newspaper advertisements, thereby interfering with freedom of speech.
“. . . one of the apparent purposes of the amendment is to prevent unions from appealing to the general public as consumers for assistance in a labor dispute. This is a basic infringement upon freedom of expression.” [18]
This analysis was the first step in the development of the publicity proviso, but nothing in the legislative history of the proviso alters our conclusion that Congress did not clearly express an intention that amended § 8 (b)(4) should prohibit all consumer picketing. Because of the sweeping language of the House bill, and its implications for freedom of speech, the Senate conferees refused to accede to the House proposal without safeguards for the right of unions to appeal to the public, even by some conduct which might be “coercive.” The result was the addition of the proviso. But it does not follow from the fact that some coercive conduct was protected by the proviso, that the exception “other than picketing” indicates that Congress had determined that all consumer picketing was coercive.
No Conference Report was before the Senate when it passed the compromise bill, and it had the benefit *202 only of Senator Kennedy’s statement of the purpose of the proviso. ' He said that the proviso preserved “the right to appeal to consumers by methods other than picketing asking them to refrain from buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods. . . . We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop . . . and can carry on all publicity short of having ambulatory picketing . . . .” [19] (Italics supplied.) This explanation does not compel the conclusion that the Conference Agreement contemplated prohibiting any consumer picketing at a secondary site beyond that which urges the public, in Senator Kennedy’s words, to “refrain from trading with a retailer who sells such goods.” To read into the Conference Agreement, on the basis of a single statement, an intention to prohibit all consumer picketing at a secondary site would depart from our practice of respecting the congressional policy not to' prohibit peaceful picketing except to curb “isolated evils” spelled out by the Congress itself.
Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product. The proviso indicates no more than that the Senate conferees’ constitutional doubts led Congress to authorize publicity other than picketing which persuades the customers of a secondary employer to stop all trading with him, but not such publicity which has *203 the effect of cutting off his deliveries or inducing his employees to cease work. On the other hand, picketing which persuades the customers of a secondary employer to stop all trading with him was also to be barred.
In sum, the legislative history does not support the Board’s finding that Congress meant to prohibit all consumer picketing at a secondary site, having determined that such picketing necessarily threatened, coerced or restrained the secondary employer. Rather, the history shows that Congress was following its usual practice of legislating against peaceful picketing only to curb “isolated evils.”
This distinction is opposed as “unrealistic” because, it is urged, all picketing automatically provokes the public to stay away from the picketed establishment. The public will, it is said, neither read the signs and handbills, nor note the explicit injunction that “This is not a strike against any store or market.” Be that as it may, our holding today simply takes note of the fact that Congress has never adopted a broad condemnation ' of peaceful picketing, such as that urged upon us by petitioners, and an intention to do so is not revealed with that “clearest indication in the legislative history,” which we require. Labor Board v. Drivers Local Union, supra.
We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8 (b) (4) (ii). We hold that it did not fall within that area, and therefore did not “threaten, coerce, or restrain” Safeway. While any diminution in Safeway’s purchases of apples due to a drop in consumer demand might be said to be a result which causes respondents’ picketing to fall literally within the statutory prohibition, *204 “it is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.” Holy Trinity Church v. United States, 143 U. S. 457, 459. See United States v. American Trucking Assns., 310 U. S. 534, 543-544. When consumer picketing is employed only to persuade customers not to buy the struck product, the union’s appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer’s purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer.[20]
We disagree therefore with the Court of Appeals that the test of “to threaten, coerce, or restrain” for the purposes of this case is whether Safeway suffered or was likely to suffer economic loss. A violation of § 8 (b) (4) (ii)(B) would not be established, merely because respondents’ picketing was effective to reduce Safeway’s *205 sales of Washington State apples, even if this led or might lead Safeway to drop the item as a poor seller.
The judgment of the Court of Appeals is vacated and the case is remanded with direction to enter judgment setting aside the Board’s order.

It is so ordered.

Mr. Justice Douglas took no part in the consideration or decision of this case.
APPENDIX TO OPINION OF THE COURT.
“Notice to Storage [sic] Manager and Store Employees.
“We are advised that you are presently engaged in selling Washington State Apples.
“The 1960 crop of Washington State Apples is being packed by non-union firms, including 26 firms in the Yakima Valley. Prior to this year, the 26 Yakima Valley firms had been parties to a collective bargaining contract with Teamsters Union Local 760 of Yakima, Washington, but this year, when a new contract was being negotiated, the employers took the position that many of the basic provisions of the prior contract, such as seniority, overtime, protection against unjust discharge, grievance procedure and union security, should be weakened or eliminated entirely. These extreme demands plus a refusal to bargain in good faith led to a strike against the employer. The union made all possible efforts to avoid this strike as did outside agencies who were assisting in the negotiations. Even the Governor of the State of Washington, the Honorable Albert D. Rosellini, intervened and suggested that the parties agree to a fact finding committee or arbitration. The union agreed to these proposals but the employers declined.
“The employer’s refusal to bargain in good faith has caused the Seattle office of the National Labor Relations *206 Board to prepare a complaint against the employers, charging them with unfair labor practices in violation of federal law.
“The strike at Yakima is still continuing and in order to win this strike, we must ask the consuming public not to purchase Washington State Apples.
“Therefore, we are going to place peaceful pickets at the entrances to your store for the purpose of trying to persuade the public not to buy Washington Apples. These pickets are being instructed to patrol peacefully in front of the consumer entrances of the store, to stay away from the delivery entrances and not to interfere with the work of your employees, or with deliveries to or pickups from your store. A copy of the instructions which have been furnished to the pickets is attached herewith.
“We do not intend that any of your employees cease work as a result of the picketing. We ask that you advise your employees of our intentions in this respect, perhaps by posting this notice on your store bulletin board.
“If any of your employees should stop work as a result of our program, or if you should have any difficulties as far as pickups and deliveries are concerned, or if you observe any of the pickets disobeying the instructions which they have been given, please notify the undersigned union representative at once and we will take steps to see that the situation is promptly corrected.
“As noted above, our information indicates that you are presently selling Washington State Apples. If, however, this information is not correct and you are selling apples exclusively from another state, please notify the undersigned and we will see that the pickets are transferred to another store where Washington State Apples are actually being sold.
“Thank you for your cooperation.”
The instructions to pickets read as follows;
*207 “Instructions to Pickets.
“Dear Picket:
“You are being asked to help publicize a nationwide consumer boycott aimed at non-union Washington State Apples. To make this program a success your cooperation is essential. Please read these instructions and follow them carefully.
“1. At all times you are to engage in peaceful picketing. You are forbidden to engage in any altercation, argument, or misconduct of any kind.
“2. You are to walk back and forth on the sidewalk in front of the consumer entrances to the grocery stores. If a particular store is located toward the rear of a parking lot, you are to ask the store manager for permission to walk back and forth on the apron or sidewalk immediately in front of the store; but if he denies you this permission, you are to picket only on the public sidewalk at the entrances to the parking lot. As far as large shipping centers are concerned, you will be given special instruction for picketing in such locations.
“3. You are not to picket in front of or in the area of any entrance to the store which is apparently set aside for the use of store employees and delivery men. As noted above, you are to limit your picketing to the consumer entrances to the store.
“4. This union has no dispute with the grocery stores, and you are forbidden to make any statement to the effect that the store is unfair or on strike. You are also forbidden to request that the customers not patronize the store. We are only asking that the customers not buy Washington State apples, when they are shopping at the store.
“5. Similarly, you are not to interfere with the work of any employees in the store. If you are asked by these employees what the picketing is about, you are to tell them it is an advertising or consumer picket and that *208 they should keep working. Likewise if you are asked by any truck drivers who are making pickups or deliveries what the picket is about, you are to advise that it is an advertising or consumer picket and that it is not intended to interfere with pickups or deliveries (i. e. that they are free to go through).
“6. If you are given handbills to distribute, please distribute these handbills in a courteous manner and if the customers throw them on the ground, please see that they are picked up at once and that the area is kept clean.
“7. You are forbidden to use intoxicating beverages while on duty or to have such beverages on your person.
“8. If a state official or any other private party should complain to you about the picketing, advise them you have your instructions and that their complaints should be registered with the undersigned union representative.
“9. These instructions should answer most of your questions concerning this program. However, if you have any additional questions or if specific problems arise which require additional instructions, please call the undersigned.”

 As amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) §704 (a), 73 Stat. 542-543, 29 U. S. C. (Supp. IV, 1963) § 158 (b) (4).

 The firms, 24 in number, are members of the Tree Fruits Labor Relations Committee, Inc., which acts as the members’ agent in labor disputes and in collective bargaining with unions which represent employees of the members. The strike was called in a dispute over the terms of the renewal of a collective bargaining agreement.

 The placard worn by each picket stated: “To the Consumer: Non-Union Washington State apples are being sold at this store. Please do not purchase such apples. Thank you. Teamsters Local 760, Yakima, Washington.”
A typical handbill read:
“DON’T BUY WASHINGTON STATE APPLES
THE 1960 CROP OP WASHINGTON STATE APPLES IS BEING PACKED BY NON-UNION FIRMS
Included in this non-union operation are twenty-six firms in the Yakima Valley with which there is a labor dispute. These firms are charged with being
UNFAIR
by their employees who, with their union, are on strike and have been replaced by non-union strikebreaking workers employed under substandard wage scales and working conditions.
In justice to these striking union workers who are attempting to protect their living standards and their right to engage in good-faith collective bargaining, we request that you
DON’T BUY WASHINGTON STATE APPLES
Teamsters Union Local 760 Yakima, Washington
This is not a strike against any store or market.
(P.S. — PACIFIC FRUIT & PRODUCE CO. is the only firm packing Washington State Apples under a union contract.)”

 Copies of the letter delivered to each store manager and of the instructions to pickets are printed in the Appendix.

 The complaint charged violations of both subsections (i) and (ii) of § 8 (b) (4). The Board held, however, that as the evidence indicated “that Respondents’ picketing was directed at consumers only, and was not intended to 'induce or encourage’ employees of Safeway or of its suppliers to engage in any kind of action, we find that by such picketing Respondents did not violate Section 8 (b) (4) (i) (B) of the Act.” 132 N. L. R. B., at 1177. See also Labor Board v. Servette, Inc., ante, p. 46, decided today.

 Accord: Burr & Perfection Mattress Co. v. Labor Board, 321 F. 2d 612 (C. A. 5th Cir.).

 The distinction between picketing a secondary employer merely to “follow the struck goods,” and picketing designed to result in a generalized loss of patronage, was well established in the state cases by 1940. The distinction was sometimes justified on the ground that the secondary employer, who was presumed to receive a competitive benefit from the primary employer’s nonunion, and hence lower, wage scales, was in “unity of interest” with the primary employer, Goldfinger v. Feintuch, 276 N. Y. 281, 286, 11 N. E. 2d 910, 913; Newark Ladder & Bracket Sales Co. v. Furniture Workers Local 66, 125 N. J. Eq. 99, 4 A. 2d 49; Johnson v. Milk Drivers & Dairy Employees Union, Local 854, 195 So. 791 (Ct. App. La.), and sometimes on the ground that picketing restricted to the primary employer’s product is “a primary boycott against the merchandise.” Chiate v. United Cannery Agricultural Packing & Allied Workers of America, 2 CCH Lab. Cas. 125, 126 (Cal. Super. Ct.). See I Teller, Labor Disputes and Collective Bargaining § 123 (1940).

 S. 748, 105 Cong. Rec. 1259-1293, II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 975, 987.

 105 Cong. Rec. 6190, II Leg. Hist. 1034.

 105 Cong. Rec. 1283, 6428, II Leg. Hist. 979, 1079 (Senator Goldwater); 105 Cong. Rec. 1729-1730, II Leg. Hist. 993-994 (remarks of the Secretary of Labor, inserted in the record by Senator Dirksen).
It is true that Senator Goldwater referred to consumer picketing when the Conference bill was before the Senate. His full statement reads as follows: “the House bill . . . closed up every loophole in the boycott section of the law including the use of a secondary consumer picket line, an example of which the President gave on his nationwide TV program on August 6. . . .” 105 Cong. Rec. 17904, II Leg. Hist. 1437. The example given by the President was this: “The employees [of a furniture manufacturer] vote against joining a particular union. Instead of picketing the furniture plant itself, un *198 scrupulous organizing officials . . . picket the stores which sell the furniture .... How can anyone justify this kind of pressure against stores which are not involved in any dispute? . . . This kind of action is designed to make the stores bring pressure on the furniture plant and its employees ...” 105 Cong. Rec. 19954, II Leg. Hist. 1842. Senator Goldwater’s own definition of what he meant by a secondary consumer boycott is even more clearly narrow in scope: “A secondary consumer, or customer, boycott involves the refusal of consumers or customers to buy the products or services of one employer in order to force him to stop doing business with another employer.” 105 Cong. Rec. 17674, II Leg. Hist. 1386.

 105 Cong. Rec. 6667, II Leg. Hist. 1194.

 105 Cong. Rec. 6232, II Leg. Hist. 1037.

 105 Cong. Rec. 17882-17883, II Leg. Hist. 1426,

 United, Wholesale & Warehouse Employees, Local 261, v. Labor Board, 108 U. S. App. D. C. 341, 282 F. 2d 824; Labor Board v. International Union of Brewery Workers, 272 F. 2d 817, 819 (C. A. 10th Cir.); Labor Board v. Business Machine & Office Appliance Mechanics Conference Board, 228 F. 2d 553, 559-561 (C. A. 2d Cir.), cert. denied, 351 U. S. 962.

 The Landrum-Griffin bill, H. R. 8400, was substituted on the floor of the House for the bill reported by the House Committee on Education and Labor, H. R. 8342; the language of the two bills with respect to secondary boycotts is compared at II Leg. Hist. 1912.

 105 Cong. Ree. 15531-15532, II Leg. Hist. 1568.

 105 Cong. Rec. 15673, II Leg. Hist. 1615. The same concern with direct coercion of secondary employers appears in President Eisenhower’s message accompanying the Administration bill. S. Doc. No. 10, 86th Cong., 1st Sess., I Leg. Hist. 81-82. See also minority report of the Senate Committee on the Kennedy-Ervin bill. S. Rep. No. 187, 86th Cong., 1st Sess., I Leg. Hist. 474-475.

 105 Cong. Ree. 16591, II Leg. Hist. 1708.

 105 Cong. Rec. 17898-17899, II Leg. Hist. 1432.

 For example: If a public appeal directed only at a product results in a decline of 25% in the secondary employer’s sales of that product, the corresponding reduction of his purchases of the product is due to his inability to sell any more. But if the appeal is broadened to ask that the public cease all patronage, and if there is a 25% response, the secondary employer faces this decision: whether to discontinue handling the primary product entirely, even though he might otherwise have continued to sell it at the 75% level, in order to prevent the loss of sales of other products.