**UNITED STATES MAINTENANCE COR-
PORATION, Plaintiff,**

v.

**SERVICE EMPLOYEES INTERNATION-
AL UNION, LOCAL 82, AFL–CIO,
Defendant.**

Civ. A. No. 74–1212.

United States District Court,
District of Columbia.

Nov. 18, 1974.

Joel I. Keiler, Washington, D. C., for plaintiff.

Thomas Powers, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

GESELL, District Judge.

United States Maintenance Corporation (hereafter "Maintenance") sues Service Employees International Union, Local 82, AFL–CIO (hereafter "Local 82") for damages, claiming that it was injured in its business by reason of an unfair labor practice. Jurisdiction exists under Section 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187. The particular unfair labor practice is defined under Section 8(b)(4)(ii)(B), which states in relevant part as follows:

> (b) It shall be an unfair labor practice for a labor organization or its agents (4)(ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an ob-

ject thereof is (B) forcing or requiring any person to . . . cease doing business with any other person . . . .

More specifically, Maintenance claims that Local 82 threatened Gustave Ring, who owns and operates two buildings covered by a labor contract with Local 82, with a strike, an object of which was to force Ring to cease doing business with Maintenance. Local 82 denies any liability on both factual and legal grounds, as will appear. The matter was tried to the Court without a jury and the following constitutes the Court's findings of fact and conclusions of law.

Local 82 entered into a three-year agreement with Ring dated September 8, 1971. The agreement contained an arbitration clause and an explicit undertaking not to strike or picket during the term of the agreement. Under the provisions of the contract (paragraph 17), Ring undertook not to subcontract the work covered by the agreement without ten-day notice to the Local and agreed that any subcontract must provide that employees of the subcontractor "shall be paid wages at least equal to the wages provided for in the agreement." Local 82 represented maintenance employees such as maids, janitors and elevator operators, and the contract treated two buildings owned by Ring as a package.

Beginning in January, 1974, Ring commenced consideration of subcontracting the work, believing that the quality of the maintenance in his buildings and its cost required a change. Local 82 gave the required 90-day notice in June of 1974 that it wished to negotiate a new contract when the existing contract expired in September and Ring, on July 3, gave ten-day notice that he intended to subcontract all the work, except elevator operators, to Maintenance as of August 1, 1974. In response, the Local requested a meeting and one was held at the Local's convenience on July 16, but in the meantime, on July 13, the work was actually subcontracted by Ring to Maintenance. On July 16, representatives of Ring and the Local met. The testimony conflicts as to what occurred at this crucial meeting. It is clear that Local 82 considered Maintenance as a substandard, non-unionized concern and objected vigorously to the subcontract on the ground that Maintenence would not maintain the standard of hourly pay, vacation and sick leave benefits that were in the contract. Whether Maintenance in fact intended to pay at a rate in accordance with the contract is in dispute.[1] However, it is clear from the entirely credible testimony of the President of Local 82, Ms. Neal, that at the time of the crucial July 16 meeting she and the other members of the Union's negotiating team reasonably believed, based on conversations with Maintenance's employees on other jobs, that Maintenance's general practice was to pay substandard wages. By his own admission, Ring's representative, Mr. Cook, did nothing to correct this impression at the July 16 meeting, stating that he didn't know what Maintenance was

1. Under ¶ 2(a) of the contract, the employees represented by Local 82 were receiving $2.45 per hour at the time. However, under ¶ 2(c) of the agreement, new employees apparantly could be hired at $2.05 per hour.

Maintenance in fact planned to pay its employees $2.10 per hour, although the evidence showed that the Union's representatives did not know this precise figure, but instead relied on their knowledge of Maintenance's general practice of paying substandard wages. Since Maintenance did not plan to retain any of the old unionized employees when it took over the job, it contends the $2.05 "new hiring" rate was applicable and that therefore there was no violation of the subcontracting clause of the contract. To make matters even more complicated, there was uncontradicted testimony that the practice of the parties at the time was to bring on "new hires" at the rate of $2.20 per hour, an interpretation of the contract which finds some support in the text of ¶ 2(c). In view of the Court's finding that there was a bona fide, reasonable belief on the part of the Union representatives that Ring intended to violate the subcontracting provisions of the contract, the Court finds it unnecessary to give an authoritative construction to the ambiguous terms here summarized.

going to pay and didn't care since that was entirely between Maintenance and its employees.

Cook claims that Local 82 representatives said that Maintenance was not fair and that the Local would picket Ring's buildings to "punish" Ring for using Maintenance. Local 82 denies this assertion and the Court finds that no threat in this form was made. On the basis of the preponderance of the evidence, it appears that Local 82's representatives emphatically stated that they would establish an "informational" picket line no matter to whom Ring subcontracted the work if the subcontractor failed to pay wage rates and provide working conditions consistent with the existing wage scale at the buildings. Ring's representatives were concerned that a picket line would be set up. Ring himself did not want any picketing or union trouble and for this reason cancelled the subcontract after consultation with Maintenance. He was entitled to do this under a 30-day cancellation clause of the subcontract.

Maintenance contends that an object of the threatened picketing was to force Ring, as he eventually did, to cease doing business with Maintenance. In support of this contention, evidence was introduced establishing that the Local had lost its agreement with Maintenance in 1970 and had been trying, although somewhat sporadically, over a period of time again to organize Maintenance. At the meeting there was no threat to picket any of the other approximately 50 buildings where Maintenance was performing work and it is also clear that Local 82 made no effort to invoke its arbitration rights under the contract against Ring for any alleged breach of the subcontracting provisions. Maintenance also attempted to show that Local 82 failed to object to a subsequent subcontract made by Ring with a firm known as Gotham Building Maintenance, another non-union maintenance contractor, who was put in place without the ten-day notification required under the agreement. But this latter circumstance must be discounted because the present suit and other legal proceedings were by then already under way. Although the National Labor Relations Board Regional Office dismissed the complaint of Maintenance claiming a secondary boycott violation, the issue is again tendered in this proceeding.

Local 82 argues that its sole intention was to engage in "informational" picketing, cf. N. L. R. B. v. Fruit Packers Local 760 (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1963); compare 29 U.S.C. § 158(b)(4), second proviso, with 29 U.S.C. § 158(b)(7)(C), second proviso; and points to the signs it had printed but never used, which read as follows:

United States Maintenance
Corporation

UNFAIR

Does Not Provide

S.E.I.U. Local 82, AFL–CIO

Conditions of Employment

No Dispute With Any Other Person

Service Employees Int'l

Union, Local 82

The Court does not reach the defendant's contention that it merely announced an intention to publicize a dispute with Maintenance with "informational" picketing at Ring's premises, activity which is arguably protected under the doctrine of the "Tree Fruits" case, supra, because the Court has concluded after weighing the evidence as a whole that defendant was engaged in a primary dispute with Ring.

I.  *Primary Dispute with Ring.*

Local 82 reasonably believed that Ring was about to violate the subcontracting clause of the contract by bringing in a subcontractor who paid substandard wages. Of course, merely because the understanding between a union and its primary employer is embodied in a contract clause, the Union is not automatically insulated from the charge of a prohibited secondary boycott. The

Court must look to the wording of the clause itself to insure that the clause is not so fashioned that it purports to authorize "secondary" motives otherwise prohibited. Plumbing Local 636 v. N. L. R. B., 108 U.S.App.D.C. 24, 278 F.2d 858, 864 (1960); Building Trades Council v. N. L. R. B., 117 U.S.App.D.C. 239, 328 F.2d 540, 541 n. 8 (1964). Here the clause in issue prohibits subcontracting at less than union scale wages. As such, it suffers from no such secondary motive. On the contrary, it was clearly designed to protect the jobs of members of the bargaining unit from the very events which appear to have transpired in this case, that is, the employer succumbing to the temptation to eliminate jobs of members of the bargaining unit by resorting to the cheap labor of substandard outside contractors. It is established that reducing this risk is an entirely legitimate undertaking fashioned to preserve the economic integrity of the primary bargaining unit. Meat & Highway Drivers v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709, 715 n. 15, 716 (1964); Orange Belt District Council v. N. L. R. B., 117 U.S.App.D.C. 233, 328 F.2d 534, 538–539 (1964).

■ Even where, as here, the contract clause itself by its terms embodies no prohibited secondary objects, it is possible that a union might seize upon the clause in particular circumstances to carry out prohibited secondary objectives. The Court finds, based largely on the testimony of Ms. Neal, that no such objects animated Local 82's conduct in this case. Ms. Neal was a credible witness, exhibiting by demeanor and her responses an obvious genuineness. The Court accepts her testimony that when Local 82 threatened to picket Ring's buildings it had as its object the enforcement of the subcontracting clause requiring union scale wages. The Local would have taken the same position if any contractor paying substandard wages had been bought in. This conclusion finds support in the fact that Local 82 never planned picketing at any other of the fifty buildings where Mainte-

nance did work, and is unaffected by the fact that the Union's attorneys felt that the picket signs ought to mention United States Maintenance by name.

■ Plaintiff has suggested that the Court should reject the notion that Local 82 was involved in a primary dispute with Ring relating to possible violation of the subcontracting clause since any strike on this account would have violated the terms of the no-strike clause in the contract between Local 82 and Ring. The Court finds no merit in this argument under the circumstances. When it appeared to the Local at the July 16 meeting that Ring intended to violate the subcontracting clause, the Union could have demanded arbitration under the contract. If the Union's threat to put up a picket line contemplated a work stoppage by members of the bargaining unit, and if Local 82 had actually carried out this threat, presumably it would have been a violation of the Union's obligations under the no-strike clause of the contract with Ring and Ring might have been entitled to sue for injunctive relief and damages. However, this is simply not what occurred. The statements of Cook at the July 16 meeting, as the Court has found them to have been, were an announcement by the employer of an intention to proceed regardless of the provisions of the subcontracting clause. The Union responded by threatening to picket, even though it may not have had the right to do so under the contract, and Ring backed down. Such interchanges are hardly rare in the hurly-burly of labor negotiations and there was ample provocation, particularly given additional facts considered under section II below. They provide absolutely no basis for concluding that Local 82 was concerned with anything more than seeing to it that the subcontracting provisions of its contract with Ring were obeyed.

The evidence will not support a verdict for the plaintiff on the theory that Local 82 violated Section 8(b)(4)(ii)(B).

## II. *Maintenance as "Ally."*

■ Finally, as an alternative ground for its holding, the Court finds on the facts of this case, that Maintenance was not in any event a neutral party entitled to complain of a secondary boycott. The courts have long recognized the so-called "ally doctrine" under which a party who takes over "struck work" from a primary employer involved in a labor dispute becomes himself so directly involved in the primary dispute that he loses his neutrality and may no longer invoke the protective mantle of congressional policy against secondary boycotts to shield his own involvement. Douds v. Metropolitan Federation of Architects, 75 F.Supp. 672 (S.D.N.Y.1948); Laborer's Local 859 v. N. L. R. B., 144 U.S. App.D.C. 318, 446 F.2d 1319 (1971); *see also*, Woodwork Manufacturers v. N. L. R. B., 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). While this doctrine appears to have been confined in the past to situations where a strike is actually in progress between union and primary employer before the "ally" takes over work which would otherwise be performed by the union, the rationale of the "ally doctrine" is nonetheless applicable to the particular facts of this case.

■ The evidence showed that within a few days after Local 82 noti-fied Ring of its desire to renegotiate the terms of their contract, Ring subcontracted out the bulk of the work being performed by the Union to Maintenance. Implicit in the demand by Local 82 for renegotiation was a threat to use economic power in the form of a strike if a new contract could not be reached through collective bargaining. Rather than allowing this process to run its course, Ring sought to short-circuit it by contracting out the bulk of the work previously done by members of Local 82.[2] Furthermore, the evidence showed that Maintenance, if not indeed an active co-participant in the plan, was at least well aware of it.[3]

Had the process of bargaining on the request of Local 82 for contract renegotiation run its course of impasse, and had the Union struck before Maintenance was brought in to take over the work previously performed by striking union members, there can be no doubt under the decided cases that Maintenance would have been an "ally" unable to complain of a "secondary boycott." Rather than allowing events to follow that course, however, Ring, with the full knowledge and concurrence of Maintenance, pre-empted the process by bringing in Maintenance to take over the union work at the mere threat to invoke economic power which was implicit in

2. The Court is not unaware of the possibility that Ring's decision to subcontract out the bulk of the union work rather than attempt renegotiation, if lacking in good faith and sound business justification, might amount to an unfair labor practice under § 8(a)(5) of the L.M.R.A., 29 U.S.C. § 158(a)(5), which would have entitled the Union to seek appropriate relief before the National Labor Relations Board. *See, e. g.*, N.L.R.B. v. Brown-Dunkin Co., 287 F.2d 17 (10th Cir. 1961). (Bad faith found even though subcontracting under consideration before the duty to bargain attached.) However, since it is settled that a plaintiff's right to sue for damages under § 303 of the Act, 29 U.S.C. § 187. does not depend on any prior administrative determination that an unfair labor practice has been committed, International Longshoremen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952), it would be inappropriate to hold that a defendant could not raise related matters by way of defense in a § 303 suit because of a failure to pursue possible administrative remedies before the Board.

The Court cannot find that Ring acted in bad faith here on the proof presented. The "ally doctrine" is not, however, predicated on anti-union animus, but rather on the simple fact that contracting out struck work undermines the union's threat to resort to economic power if the ally will be shielded by the prohibition against secondary boycotts.

3. Not only had Ring and Maintenance engaged in active planning discussions prior to signing their agreement, but almost immediately thereafter, Ring—acting through counsel for Maintenance—brought a petition for a new election with the N.L.R.B. seeking de-certification of the Union as the bargaining representative for the nine elevator operators whose jobs were not to be taken over by Maintenance.

the request by Local 82 for renegotiation.[4] The "ally doctrine" has the salutary purpose of preventing congressional solicitude for the rights of neutrals from becoming perverted into a device for vitiating the protected rights of union members to bargain, and if need be, to strike; it cannot be subverted by formal requirements which ignore the underlying realities.

Therefore, on the facts of this case, where a primary employer seeks to avoid imminent bargaining by subcontracting out work which would otherwise be performed by union members, and at least where the record also indicates that the subcontractor was a knowing party to such a plan, the Court holds that the subcontractor has become an "ally" who has injected himself into the primary dispute to such an extent that he can no longer seek damages for the threat of a secondary boycott.

Judgment is entered for defendant. Defendant's request for counsel fees is denied.

So ordered.

---

4. It is of course true that Ring retained the right, under ¶ 17 of the contract which was then in effect and had another month to run, to subcontract out work provided he paid union scale wages, as discussed, *supra*. However, the subcontract with Maintenance, despite a standard 30-day cancellation clause, was expected by the parties to run for a much longer period. In intention and practical effect, then, it eliminated the need to enter into bargaining with the Union on its demand to renegotiate a new contract.