Harold Hyman, J.
Plaintiff, owner and operator of two retail stores at which it sells fresh fruits and vegetables to the consuming public and which it has been so doing for several years, brings this action against certain individual defendants (pickets), one of whom is George Morrison, a Maryknoll priest, and also against the United Farm Workers of America (White-stone Office), AFL-CIO (hereinafter referred to as UFW), seeking a permanent injunction restraining said defendants "or persons acting or pretending to act in their behalf’ from in any wise ordering, directing, advising or encouraging picketing or any other form of interfering with any customers of plaintiff, from picketing in front of plaintiff’s premises or in the vicinity thereof, from intimidating, admonishing or exhorting any people in front of or in the vicinity of plaintiff’s premises, from continuing to carry placards or emblems bearing the legend that plaintiff is unfair to union labor or to defendant union, that the products sold by plaintiff are unwholesome so as to create a false impression in the minds of the public with regard thereto, from adopting any other procedure which conveys false impressions in the public’s mind that plaintiff is unfair to organized labor or to defendant union, from committing or attempting to commit damage to plaintiff’s premises; and for damages.
Along with the summons and complaint and supporting affidavit, plaintiff obtained an order directing defendants to show cause why a preliminary injunction, pending final determination of the action, should not be granted.
A hearing on the application for the preliminary injunction was thereupon held, with all parties having adduced all of their evidence, and submitting memoranda of law.
The facts indicate that plaintiff operates two retail fruit and vegetable stores, one at 25-07 Broadway, Astoria, New York, and the other at 135-41 Roosevelt Avenue, Flushing, New York; one store is operated by the husband, Mr. Blake; the other by the wife, Mrs. Blake. Each store has two additional employees. The store in Flushing is located right off the corner of Main Street and Roosevelt Avenue, close to the subway entrance, close by and directly facing a bus stop. *1014 Plaintiff also displays its fruits and vegetables in boxes or stands in front of the store for easy perusal, selection and purchase by consumers. Two of its most important and main items of merchandise are grapes and lettuce; the sale or nonsale of such items either results in a business profit or loss; without the normal sale of such items plaintiff could not continue in business. Before the occurrences hereinafter set forth, plaintiff had "signed up” with the Retail Fruit Clerks Union AFL-CIO.
Approximately three months prior to the action having been brought, one of the defendants, George Morrison, the Maryknoll priest, spoke to Mr. Blake at the Flushing store, at which time Morrison stated that "if plaintiff did not stop selling grapes and lettuce other than such as were picked by UFW his store would be picketed”. Plaintiff advised Morrison that his stores were union shops; that there was no strike among or by his employees; that his purchase at the market of such articles was such as having all been "union processed”; that each box or carton was so stamped "I.B. of T.C.W. & H. of America”; that Morrison nevertheless threatened him with picketing unless plaintiff agreed to "sign up” not to sell any lettuce or grapes except such as had been picked only by the UFW.
Plaintiff, caught between two unions, refused to adhere to defendants’ demands; defendants, including Morrison, commenced picketing the store on Roosevelt Avenue.
The picketing was conducted in front of the store, very close to the outside displays. The pickets varied in number from 12 down to 4, every Friday evening and all day Saturday, which were plaintiff’s best business days. The pickets carried placards or signs consisting of large cardboard posters reading "DON’T BUY GRAPES — LETTUCE — UNITED FARM WORKERS, AFL-CIO ON STRIKE”; the size of the above lettering was noticeably very large, giving the unknowing public an impression that there was an actual strike of plaintiff’s employees against plaintiff.
In addition, some of the pickets carried large signs stating in large lettering "boycott grapes — lettuce and gallo WINES — UNITED FARM WORKERS ON STRIKE” (the size of the above lettering was also noticeably large) and also gave the impression that there was an actual strike of plaintiff’s employees in progress against plaintiff and Gallo Wines.
In addition, some of the pickets handed out to people *1015 passing by or going into the store, leaflets displaying a young child apparently seated on a box of grapes stating "25% of farm workers are children” and also stating "There are about 3 million farm workers in the US today, more than 800,000 of whom are children under 16 years of age”. Some of the pickets shouted at customers "don’t buy grapes!” Also, Morrison, the Maryknoll priest, shouted to and at customers that plaintiff was a "murderer, that people die from eating grapes” and that plaintiff’s grapes "were picked by child labor”, thereby giving the general public the false impression that plaintiff murdered people and also sponsored child labor. Defendants’ pickets blocked the entrance to the store, making it necessary for the plaintiff to call the police on several occasions; such pickets interfered with customers by blocking the store entrance at least 20 times, thereby blocking customers attempting to make purchases and, as a result thereof, customers just walked away; also, defendant Morrison and other pickets shouted loudly to customers or potential customers who approached the store, "Go around the corner and buy from Red Apple — he signed up with us”. The latter statement was admittedly made by defendant Morrison.
All in all, plaintiff maintains that on account of such harassment, customers were and are intimidated and therefore stayed away from the store, causing his gross business to drop very considerably, because the greater part of his business consisted of the sale of grapes and lettuce, the sale of which, to make a sufficient gross profit, he depended upon so as to keep his business going.
As many times as plaintiff attempted to remonstrate with defendants, all he would hear from them, particularly from Morrison, was, "When you sign up, we’ll go”.
Since this litigation directly pertains to "agricultural laborer(s)”, who are excluded by the National Labor Relations Act from Federal control by the National Labor Relations Board (US Code, tit. 29, § 152, subd. [3]; C. Comella, Inc. v United Farm Workers Organizing Committee, 33 Ohio App 2d 61, 71) it therefore remains within the jurisdiction of the State court (Matter of Phalen v Theatrical Protective Union, 22 NY2d 34, cert den 393 US 1000); and, since the National Labor Relations Act does not control, State labor legislation, if any, does control, or in its absence, common law or case law would control. (C. Comella, Inc. v United Farm Workers Organizing Committee, supra, p 71.) Here New York State has enacted *1016 legislation, namely, Labor Law (art. 22-A, §§ 807, 808), which provide, as to its pertinent parts thereof: "§ 807. * * * 1. No court nor any judge thereof shall have jurisdiction to issue any restraining order or a temporary or permanent injunction in any case involving or growing out of a labor dispute, as hereinafter defined, except after a hearing, and except after findings of all the following facts”. (Emphasis supplied.) Section 807 (subd. 10, par. [c]) then defines the term "labor dispute” to mean and to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee.”
The Legislature having defined the term "labor dispute” then stated when a case shall be deemed to involve or grow out of a labor dispute (Labor Law, § 807, subd. 10, par. [a]).
Our courts have held that in order to justify picketing by a union, not only must there be in existence a genuine "labor dispute”, but that the person or persons picketing must bear some relationship to the dispute (London Character Shoe Corp. v Davis, 31 NYS2d 807, affd 263 App Div 865). Since a "secondary boycott” is illegal, upon the theory that a secondary employer who is neutral or innocent should not be made to suffer because he is not part of the primary labor dispute (Woodwork Mfrs. v NLRB, 386 US 612, rehearing den 387 US 926; C. Comella, Inc. v United Farm Workers Organizing Committee, 33 Ohio App 2d 61, 74, supra), he cannot, against his will, be made an ally of one of the parties so as to make permissible that which is not by creating a fictitious so-called "unity of interest” where none actually exists.
The courts have recognized the clear distinction between picketing a secondary employer merely to follow the "struck merchandise” and picketing which is solely designed to cause a secondary employer to lose its consuming public — customers — and thereby to cause a general loss of its business. (Labor Board v Fruit Packers, 377 US 58 [the "Tree Fruits” case].)
In the "Tree Fruits” case (supra) the union struck against the packers and warehousemen in Yakima, Washington, which sold Washington State apples to the Safeway retail *1017 stores in Seattle, Washington. The union instituted a consumer boycott against the apples in support of the strike, and placed pickets in front of the customers’ entrances of 46 Safeway stores in Seattle. These pickets wore placards and distributed handbills appealing to the customers and public generally not to buy "Washington State apples”, which was one of a great many food products sold in the stores. The placards stated that nonunion Washington State apples were being sold in the store, and "Please do not purchase such apples” (p 60). The handbill, in major part, asked the public not to buy Washington State apples because they are being packed by nonunion firms, but it clearly and unequivocally made known that "This is not a strike against any store or market” (p 60). Other things were done by the union to indicate that its sole concern was to advise and only request the public not to buy Washington State apples. Picketing was peaceful, noninterfering with ingress or egress into or out of the store or delivery entrances, noninterfering with the store workers, deliverers, deliveries or employees. The picketing hours were considerate of the employees as to the question of crossing picket lines by starting their picketing after the stores opened for business and terminating before the close of the business day. No deliveries were obstructed, and the business of the stores continued otherwise unmolested.
The National Labor Relations Board (NLRB) held "consumer picketing” in front of a "secondary establishment” to be prohibited. The Court of Appeals rejected the NLRB view and held that the statutory requirements of showing that the union’s conduct would threaten, coerce or restrain Safeway could only be satisfied by affirmative proof that a substantial economic impact on Safeway had occurred or was likely to occur as a result of the union’s conduct.
On certiorari, the Supreme Court of the United States held that peaceful consumer picketing by a union at a secondary site which is limited to persuading consumers not to buy the primary employer’s product is not an unfair labor practice under the Federal statute (377 US 58, 71, supra), but where the appeal to the public is not limited to requesting withholding purchasing, the boycotting of the "primary employer’s goods”, but does, in effect, ask the general consuming public to withhold its patronage from the secondary employer, then the union’s activities go beyond the pale, beyond the goods of the primary employer seeking the assistance of the public in *1018 forcing — coercing — the secondary employer to cooperate with and to bend to the union in its primary dispute (377 US 58, 63, supra). In such circumstances the union is therefore not merely following the struck product, but is, for all intents and purposes, deliberately creating a separate dispute with the secondary employer (377 US 58, 72, supra).
Seemingly, the latter was the deliberate intent of defendants in the instant matter — their purpose being to possibly bring itself within the intent and purpose of New York’s Labor Law (art 22-A, § 807, subd 10, pars [a], [c]), as a "labor dispute”.
But the court will not be led down the garden path by absurdity — to declare this matter to have any true legal base as a legitimate labor dispute, thereby entitling the defendants to the benefits or rights allowed by article 22-A of the Labor Law. Not only is fairness in picketing completely lacking in this case, but the coercive methods used by the pickets, their placards, handbills, their shouting at and to customers or prospective customers not to buy from plaintiff but to buy from his competitor around the corner, characterizing and calling plaintiff a murderer, insinuating that plaintiff prescribes to and supports child labor, the misleading and highly equivocal placards which insinuate a strike in plaintiff’s stores without true or clear explanation or delineation, all add up to the illegality and impropriety of the defendants’ picketing of plaintiff’s stores and to its intent at coercion of the plaintiff. This is further clearly indicated by the failure of the defendants’ placards, signs, and handbills to clearly identify plaintiff as a neutral in defendants’ dispute with the primary (unnamed) employer and their failure to in any way clarify the nature of their dispute with the primary employer. (Kaynard v Independent Routeman’s Assn., 479 F2d 1070, 1073; National Labor Relations Bd. v Twin City Carpenters Dist. Council, 422 F2d 309, 314.) The defendants’ appeal to the consumer omits dissemination of that precise type of information deemed essential in "Tree Fruits” (377 US 58, supra) to establish a product rather than a general patronage boycott of the secondary business (National Labor Relations Bd. v Twin City Carpenters Dist. Council, supra, pp 314, 315) for, a "generally worded” picket sign fails to isolate a dispute and may constitute an appeal for a general boycott against the neutral and secondary party. (Bedding, Curtain & Drapery *1019 Workers Union, Local 140, v National Labor Relations Bd., 390 F2d 495.)
Furthermore, and even assuming a primary legitimate labor dispute to exist, to allow for secondary activity by following the product of the primary employer into the hands of the retailer — “product picketing” — to be judicially sanctioned there must at least be some credible basic evidence — proof adduced to show that such a labor dispute actually does exist with a primary employer, and since this is a secondary employer, it behooves defendants to bear such burden. Here no such proof was either adduced, nor was any offered, nor was any even contained in the only opposing affidavit offered by defendant, namely, that of Morrison. True, the leaflets which defendants handed out to the public contain some language which might give cause to believe that defendants are aggrieved, because “The Teamsters Union has joined with the growers to deny the workers their rights by signing sweetheart back door contracts which completely favor the grape and lettuce growers” and they say that "this means the workers are losing whatever gains had been made” and they say, “Don’t Buy Grapes, Lettuce and Gallo Wine”, nowhere therein or in any other document introduced by defendants do they say, or even intimate that they are “On strike against the Growers”. Their placards solely use the term “on strike” and one of their leaflets says "Farm Workers are striking for justice in the fields” — but nowhere, absolutely nowhere, do defendants identify any of the growers, or any growers’ association as the primary target of their strike activity, nor do defendants identify by name or true title the so-called "Teamsters Union” as the union allegedly representing the farm workers who are picking the grapes or lettuce which they, defendants, find so utterly obnoxious and devoid of humanity.
This court is of the opinion that no legitimate labor dispute exists between these parties within the purview of article 22-A of the Labor Law of New York, nor was it the intention of the Legislature that such a matter involving such “secondary activity”, in substance an ingenious attempt at substantiating the right to “secondary boycott” under these circumstances ever the intent or purpose of the Legislature in enacting article 22-A of the Labor Law, and that therefore article 22-A of the Labor Law has no application to the instant factual situation; that this action is one basically in tort, and that in such action plaintiff would, if trial proven, be entitled to a *1020 judgment restraining defendants from the continuance of the acts complained of which would produce injury to plaintiff; that if defendants were permitted to continue doing the acts complained of by plaintiff during the pendency of this action, it would tend to render any judgment plaintiff might obtain ineffectual because the patient would have died while awaiting the final results of the operation.
Defendants submit a new theory of law in that they contend that a case tried in California, under California law and appealed to the Supreme Court of the State of California en banc, which merely had to do with collective bargaining fairness (Englund v Chavez, 8 Cal 3d 572) and wherein the plaintiff in this action had absolutely no interest, directly or indirectly, and did not participate in as a party or as a witness, and which involved an issue of whether a “sweetheart contract” was made by a union opposed to these defendants with some other employer or employers, is res judicata of this action, that a jurisdictional labor dispute exists between UFW and the Teamsters Union. Defendants are decidedly mistaken, as to the law (see Schuylkill Fuel Corp. v B & C Nieberg Realty Corp., 250 NY 304 [generally]; Israel v Wood Dolson Co., 1 NY2d 116 [identity of issues]; Cummings v Dresher, 24 AD2d 912, revd on other grounds 18 NY2d 105); and, what is more, res judicata or even collateral estoppel is an affirmative defense which must be, but has not yet been, pleaded or proven by defendants. (CPLR 3018, subd [b].)
Plaintiff’s motion for a preliminary injunction is granted, with $40 costs payable by defendants to plaintiff, and further to the extent that defendants shall not picket in front of plaintiff’s place of business, but may picket no less than 50 feet away from plaintiff’s extreme exterior store dimensions; that defendants are enjoined from using any placards indicating any strike at plaintiff’s establishment by employees or otherwise — but if the word “strike” is used in its placards it shall indicate in the same sized letters — clearly readable and observable, that the strike is not as to plaintiff’s employees or its place of business, but that it refers only to the primary employer grower — and it must fully name such primary target in equally sized large letters as above; and further, it must state that it is solely as to the grapes grown or lettuce grown by such named primary target-grower-employer; that defendants shall not approach any customer at or closer than the distance of 50 feet from the exterior extremities of the *1021 store, as aforesaid; that defendants shall not call out or insinuate that plaintiff is a murderer or child labor supporter or any other similar type of nefarious character; that defendants shall not tell any consumer or the public generally, nor attempt to influence them to buy at any other establishment; that this preliminary injunction shall issue upon plaintiff’s filing a bond in the penal sum of $1,000 pursuant to statute (CPLR 6312, subd. [b]); the order shall grant leave for either party to move at the foot thereof for further clarification, extension, modification or enforcement thereof, as the parties may be so advised in the furtherance of justice.
Defendants shall serve and file a verified formal answer to the complaint within 10 days after service of a copy of the order to be entered hereon with notice of the entry thereof upon the attorneys for defendants by ordinary mail.
The plaintiff shall place this case upon the trial calendar and be ready for trial for the May term of this court.