**PET, INCORPORATED, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**United Steelworkers of America, AFL-CIO–CLC, Intervenor-Respondent.**

**No. 79–1852.**

United States Court of Appeals, Eighth Circuit.

Submitted May 21, 1980.

Decided Jan. 30, 1981.

Rehearing and Rehearing En Banc Denied April 3, 1981.

Ralph E. Kennedy, St. Louis, Mo., for appellant.

Harry L. Browne, Michael F. Delaney, Spencer, Fane, Britt & Browne, Kansas City, Mo., amicus curiae for U. S. Chamber of Commerce; Stephen Bokat, Washington, D. C., of counsel.

Richard Bader, N.L.R.B., Washington, D. C., for appellee.

Carl Frankel, Pittsburgh, Pa., for intervenor.

Before BRIGHT, HENLEY and McMILLIAN, Circuit Judges.

HENLEY, Circuit Judge.

Pet, Incorporated filed a secondary boycott charge alleging United Steelworkers violated Section 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B) (1976). The National Labor Relations Board dismissed Pet's complaint, and Pet appeals. This court has jurisdiction pursuant to 29 U.S.C. § 160(f) (1976) because the alleged violations took place in and around St. Louis, Missouri.[1]

1. While this appeal was pending the basic labor dispute was settled and a new labor contract between Pet's subsidiary, Hussmann Refrigerator, and the Steelworkers was negotiated. Although the basic alleged offending conduct has terminated, at least for the time being, we are persuaded that the appeal is not moot. *NLRB v. Raytheon Co.*, 398 U.S. 25, 90 S.Ct. 1547, 26

Pet is a large, diversified conglomerate enterprise with plants and retail stores located throughout the United States. It currently has twenty-seven operating divisions, each engaging in separate and distinct lines of business. In the mid-1970s, most of the divisions were segregated for administrative, operational and fiscal accounting purposes into four "groups." Division presidents report directly to their respective "group" presidents, who in turn report directly to Pet's president.

Responsibility for long range planning, major capital expenditures, and other general management functions rests with Pet's Office of the Chief Executive, comprised of Pet's president and three executive vice presidents. Group presidents file monthly reports with Pet's president. The reports give forecasts of future earnings, discuss items such as industry trends and plant safety, and give analyses of variances in the forecasted (as compared with actual) sales and earnings.

The NLRB found that the divisions of Pet have a good deal of autonomy:

The various divisions of Pet operate essentially as independent business entities. No division exercises any determination, control, or influence over the administration or operation of any other division. Each division maintains a separate financial system and bank account from which it pays employees; prepares its own budget and financial statements; sets its profit targets; and pays its own bills, including payments to the Pet corporate office for reimbursement of services rendered by it. Policies regarding product line, pricing, and advertising, as well as market strategies, are determined by the divisions. Division presidents are vested with complete authority over the day-to-day operation of their respective divisions and are accountable for their divisions' profitability. They have complete authority over division labor rela-

tions and employment policies for represented and unrepresented employees and can negotiate, execute, and administer collective-bargaining agreements without prior approval from Pet's corporate offices.

A good part of Pet's business is in the area of the manufacture of food products. The products include milk, ice cream, Whitman's Chocolates, Pet-Ritz Frozen Pies, Downy Flake Frozen Breakfast Foods, Easy Jacks, Hot'N Buttery Waffles, and Funsten Nuts. Pet operates a grocery product group of divisions which produce, sell, and distribute Compliment Cooking Sauces, Heartland Cereal and Evaporated Milk, Sego Diet Food, and Musselman Fruit Products. Two of Pet's subsidiaries manufacture canned shrimp and oysters; another subsidiary manufactures Mexican food products.

Pet has operations in addition to the food products. These include plastics and label manufacturing, public warehousing and distribution, and Stuckey's and 905 stores.

Hussmann, a wholly owned subsidiary of Pet, manufactures commercial refrigeration equipment, display cases, shelving, checkout counters, and other commercial and industrial equipment. Hussmann is one of the four "groups" discussed earlier, and consists of three "divisions." It has a plant in Bridgeton, Missouri, which is part of one of these divisions. United Steelworkers (the Union) represents fifteen hundred employees of this plant. The Union does not represent any employees of Pet or its other subsidiaries; or any other Hussmann employees.

When the collective bargaining agreement covering the Bridgeton employees expired on May 1, 1977 the Union commenced an economic strike. On October 21, 1977 the Union's president announced at a press conference in the St. Louis area that, in support of the strike at the Bridgeton plant,

L.Ed.2d 21 (1970); *Local 1976, Carpenters v. NLRB*, 357 U.S. 93, 97 n.2, 78 S.Ct. 1011, 1015 n.2, 2 L.Ed.2d 1186 (1958); *Local 74, United Brotherhood of Carpenters v. NLRB*, 341 U.S. 707, 715, 71 S.Ct. 966, 970, 95 L.Ed. 1309

(1951); *NLRB v. Modine Mfg. Co.*, 500 F.2d 914, 916 n.4 (8th Cir. 1974); *Terminal Freight Handling Co. v. Solien*, 444 F.2d 699, 704–05 (8th Cir. 1971), *cert. denied*, 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972).

he was calling for a "national boycott by our 1.4 million member union of Pet, Inc., food products, their retail store outlets, and commercial refrigeration equipment."

Beginning on November 9, 1977 the Union placed advertisements in local newspapers, advising the public of the Union's strike against Hussmann's Bridgeton plant, noting that Hussmann is owned by Pet, and requesting the public to boycott Stuckey's and 905, and to refuse to buy any product of Pet. The advertisements listed seventeen products of Pet.

In October and November of 1977 the Union distributed handbills in the St. Louis area. The handbills contained the same message as the newspaper advertisements. The Union issued boycott instructions which provided that no boycott material should be distributed in the vicinity of a retail establishment owned by Pet or selling Pet products. Further, no one was to interfere with the entrance or exit of workers or others under any circumstances. The handbilling activity conformed to these instructions at all times.

Pet filed unfair labor practice charges against the Union with the NLRB, alleging that the Union violated Section 8(b)(4)(ii)'B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B) (1976), by calling for the consumer boycott. The section provides:

> It shall be an unfair labor practice for a labor organization or its agents—
>
> (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ...

Provided ..., That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

Pet argues that the handbilling and other publicity constituted restraint and/or coercion within the meaning of subparagraph (ii) of Section 8(b)(4) of the Act because it was directed against "neutral" persons— Pet and its subsidiaries. Pet further contended that the publicity proviso offered no immunity to the Union's activities because Hussmann was not a "producer" of the "products" of Pet or its subsidiaries.[2] Finally, Pet argued that a finding that the Union's conduct was unprotected by the publicity proviso would not conflict with the first amendment.

The NLRB found that the Union's activities were protected by the publicity proviso. The Board expressly refrained from deciding (1) whether Pet and its subsidiaries were "neutral" persons as to the controversy between Hussmann and the Union; (2) whether the activities constituted "coercion" or "restraint"; or (3) whether a finding that the activities were not protected by the proviso would conflict with the first amendment.

On appeal Pet asserts that the Board erred in concluding the Union's activities were protected by the proviso because

---

**2.** Pet did not contend that the Union's publicity asking consumers not to patronize 905 stores violated Section 8(b)(4)(ii) because 905 and Hussmann may be related as distributor and producer within the meaning of the proviso.

After the strike commenced, 905 stores purchased Hussmann equipment manufactured at the Bridgeton plant from an independent distributor.

Hussmann is not a "producer" of the products of Pet and its subsidiaries. Pet further contends that the findings of fact of the NLRB and the law are clear enough that this court can decide in Pet's favor the three issues that the NLRB declined to decide.

We first consider whether the Union's conduct fell within the proviso, or, more specifically, whether Hussmann is a "producer" of the products of Pet. Both the Board and federal courts have given the term "producer" a broader meaning than manufacturer or processor.

In *Lohman Sales Co.*, 132 NLRB 901, 48 L.R.R.M. 1429 (1961), a union struck a company which was engaged in the wholesale distribution of cigarettes, other tobacco products, and candies. The striking employees distributed handbills in front of stores which stocked products that Lohman distributed, advising the public of the strike and requesting the public not to purchase tobacco products or candy at the stores. Before the NLRB Lohman contended that it did not produce the products, but only handled products manufactured by others, and thus the proviso should not apply to the union's handbilling. The NLRB rejected this contention and dismissed the complaint, stating:

> [L]abor is the prime requisite of one who produces. A wholesaler, such as Lohman, need not be the actual manufacturer to add his labor in the form of capital, enterprise, and service to the product he furnishes the retailers. In this sense, therefore, Lohman, as the other employers who 'handled' the raw materials of the product before him, is one of the producers of the cigarettes distributed by his customers. A contrary view would attach a special importance to one form of labor over another and attempt to isolate fabricators of products from those who otherwise add to its value.

132 NLRB at 907, 48 L.R.R.M. at 1432 (emphasis omitted).

*Lohman Sales Co.* was approved by the Supreme Court in *NLRB v. Servette, Inc.*, 377 U.S. 46, 55, 84 S.Ct. 1098, 1104, 12 L.Ed.2d 121 (1964). *Servette* also was a case in which the primary labor dispute was with a wholesaler, and the union asked the public not to purchase the merchandise the wholesaler distributed. The Court stated:

> The proviso was the outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded.... It would fall far short of achieving this basic purpose if the proviso applied only in situations where the union's labor dispute is with the manufacturer or processor.... There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which it is an exception, and we see no basis for attributing such an incongruous purpose to Congress.
>
> The term 'produced' in other labor laws was not unfamiliar to Congress. Under the Fair Labor Standards Act, the term is defined as 'produced, manufactured, mined, handled, or in any other manner worked on ...,' 29 U.S.C. § 203(j), and has always been held to apply to the wholesale distribution of goods.

377 U.S. at 55–56, 84 S.Ct. at 1104.

In *Great Western Broadcasting Corp. v. NLRB*, 356 F.2d 434 (9th Cir.), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966) enforcing 150 NLRB 467, 58 L.R.R.M. 1019 (1964), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966), there was a strike at a television station. The union requested sponsors not to advertise on the station during the strike. The union later passed out leaflets, naming those sponsors who continued to advertise on the station. The Ninth Circuit held that the union's handbilling activity was protected by the proviso, and that the station was a "producer" of the products and services it advertised. The court noted the incongruity of regarding the television as a producer of services such as banking, inasmuch as the proviso refers to products which are "distributed" by another employer. The court stated that "the Su-

preme Court has spoken in such broad terms in *Servette* that we think the incongruity . . . may not control the ultimate decision." 356 F.2d at 436.

Although all of the three cases discussed above support a broad reading of the proviso, we do not regard them as dispositive of the present case. *Lohman Sales Co., Servette* and *Great Western Broadcasting* all found that the primary was a "producer" when the primary was directly involved in the promotion and/or distribution of products of the secondary.[3] In all three cases, the primary worked on specific products. In the present case Hussmann does not work on any specific products of Pet.

In spite of the absence of any direct relationship of Hussmann's operations to any specific product of Pet, the Board found Hussmann was still a "producer" of Pet's products, reasoning as follows:

[A]s a result of its relationship with the diversified enterprise, Hussmann applies capital, enterprise, and service to Pet and its other subsidiaries and divisions...

Diversified corporations, by their very nature, are composed of operations which provide support for and contribute to one another. The contributions of each to the others may vary considerably. However, all add to the diversification which enables the enterprise as a whole to weather economic assault on any one of its operations. All contribute profits, either actual or potential, which enhance the value of the enterprise and foster its economic viability. All contribute a measure of goodwill.

. . . Hussmann provides part of the diversification which contributes to the success of Pet and its other operations. Hussmann's acclaimed high sales and earnings generate income which inures to the benefit of Pet and to Pet's effort to maintain its other subsidiaries. The goodwill earned by Hussmann likewise enhances the reputation of all Pet operations. Consequently, Hussmann various-

ly contributes to the operation of Pet as a whole and to each of its subsidiaries and divisions and thus is a producer of all Pet enterprises products in the sense that "producer" is used in the proviso as interpreted by the Supreme Court in *Servette* and subsequent Board decisions.

We are mindful of the Supreme Court's admonition that if the Board's "construction of a statute is reasonably defensible, it should not be rejected merely because the court might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). We think that the present case is one of those rare instances in which the Board's interpretation is unreasonable and must be rejected. First, we think it totally at odds with any normal interpretation of the word "produce" to say that because Hussmann's profits inure to the benefit of Pet, Hussmann produces Pet's products. We find the connection between Pet's products and Hussmann to be highly attenuated. Should Pet sell Hussmann tomorrow, Pet would manufacture, distribute, and promote its products the same way it is doing now.

Secondly, we do not think that the Board's decision flows from *Servette, supra*, because the Supreme Court was not there considering a case in which the primary-subsidiary's products and services were unrelated to the secondary-parent's products. We note in particular the Court's comment, quoted earlier, that "[t]he term 'produced' in other labor laws was not unfamiliar to Congress. Under the Fair Labor Standards Act, the term is defined as 'produced, manufactured, mined, handled, or in any other manner worked on,' 29 U.S.C. § 203(j)." 377 U.S. at 55–56, 84 S.Ct. at 1104. Hussmann does not work on any of the products of Pet.

Accordingly, we reverse the decision of the Board that the Union's publicity activities fell within the proviso. Pet has asked us to consider three other issues not ruled upon by the Board. The first two, whether

3. Another case to the same effect is *Middle South Broadcasting*, 133 NLRB 1698, 49 L.R. R.M. 1042 (1961).

Pet and its subsidiaries are separate "persons" from Hussmann for purposes of Section 8(b)(4), and whether the Union's publicity fell within the prohibition of Section 8(b)(4)(ii), are questions initially committed to the discretion of the Board under Section 10(a), which empowers the Board "to prevent any person from engaging in any unfair labor practice . . ." listed in Section 8. 29 U.S.C. § 160(a) (1976). These questions are not trivial and are not free from difficulty. They could be decided by the Board in such a way that it will become unnecessary for us to reach the third issue which is whether, if the Union's conduct is prohibited by Section 8(b)(4)(ii), the Union's first amendment rights are violated. In the circumstances, we decline to pass upon any of the three issues not ruled upon by the Board.

Reversed and remanded for further proceedings.

McMILLIAN, Circuit Judge, dissenting.

I dissent.

By interpreting the publicity proviso without considering its place in the overall statutory scheme and without considering the legislative history, the majority substitutes its judgment not only for that of the Labor Board but also for that of Congress, which clearly intended to exempt this kind of publicity from coverage as a secondary boycott.

The publicity proviso resulted from a concern that the secondary boycott provisions in the 1959 Landrum-Griffin Act, which amended the National Labor Relations Act, were overbroad in the area of the first amendment. As the Supreme Court explained in *NLRB v. Fruit & Vegetable Packers, Local 760 (Tree Fruits)*, 377 U.S. 58, 69, 84 S.Ct. 1063, 1069, 12 L.Ed.2d 129 (1964), "the first step in the development of the publicity proviso" was an analysis prepared by Senator Kennedy and Congressman Thompson of the proposed revisions of the secondary boycott prohibitions:

The prohibition [prior to addition of the publicity proviso] reaches not only picketing but leaflets, radio broadcasts and newspaper advertisements, thereby interfering with freedom of speech.

. . . . .

. . . [O]ne of the apparent purposes . . . is to prevent unions from appealing to the general public as consumers for assistance in a labor dispute. This is a basic infringement upon freedom of expression.

105 Cong.Rec. 16591 (1959), *reprinted in* II NLRB, Legislative History of the Labor Management Reporting and Disclosure Act of 1959, at 1708 (1959) (hereinafter II Legislative History).

The Senate agreed with this criticism and by resolution instructed its members of a conference committee on the Landrum-Griffin Act to insist on a publicity proviso in the final bill. Sen.Res. 181, 86th Cong., 1st Sess., 105 Cong.Rec. 15905–06 (1959), *reprinted in* II Legislative History, *supra* at 1382–83. An analysis of Sen.Res. 181 by its sponsors specified, "There is to be no prohibition on truthful appeals to consumers . . . not to buy goods, because the manufacturer is involved in a labor dispute." 105 Cong. Rec. 15906 (1959), *reprinted in* II Legislative History, *supra* at 1383. As Senator Kennedy, who chaired the conference committee, explained,

[T]he union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site.

105 Cong.Rec. 16414 (1959), *reprinted in* II Legislative History, *supra* at 1432. *See also* 105 Cong.Rec. 14339 (1959) (remarks of Rep. Griffin), *reprinted in* II Legislative History, *supra* at 1615; 105 Cong.Rec. 16637 (1959) (remarks of Rep. Udall), *reprinted in* II Legislative History, *supra* at 1722.

The Congressional purpose could hardly be clearer: whatever secondary objectives were prohibited by § 8(b)(4)(ii)(B), activity would not be prohibited if it consisted only

of the kind of pure publicity in this case. (An exception exists if the speech had certain effects specified in the publicity proviso itself; no such effects are alleged in this case.) As the Supreme Court has explained, "There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which it is an exception, and we see no basis for attributing such an incongruous purpose to Congress." *NLRB v. Servette, Inc.,* 377 U.S. 46, 55, 84 S.Ct. 1098, 1104, 12 L.Ed.2d 121 (1964) (hereinafter *Servette*). The Board, therefore, was entirely correct in its approach to this case. Assuming the union's conduct was within the general coverage of § 8(b)(4)(ii)(B), the conduct was still not prohibited because it involved nothing other than publicity and therefore comes under the publicity proviso.

The majority rests its conclusion to the contrary upon a reading of the words of the publicity proviso apart from the legislative history or statutory purpose. *See* at 547 550. This kind of literal reading is not appropriate in interpreting the National Labor Relations Act. *NLRB v. Allis Chalmers Manufacturing Co.,* 388 U.S. 175, 179, 87 S.Ct. 2001, 2005, 18 L.Ed.2d 1123 (1967). The " 'familiar rule, that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers' " has "particular application in the construction of labor legislation ..." *National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. 612, 619, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357 (1967), *citing Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). For example, under a literal reading, the secondary boycott provision, § 8(b)(4), would apply not only to secondary activity; the language read literally would also reach primary strikes by employees against their own employer. *Local 761, IUE v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). The statute is not read literally because the Congressional intent expressed through the legislative history and statutory scheme was not to prohibit primary

strikes. *Id.* In this case the majority rests its interpretation of the publicity proviso entirely on the statutory words, contrary to the teaching of *Muniz v. Hoffman,* 422 U.S. 454, 469–70, 95 S.Ct. 2178, 2186, 45 L.Ed.2d 319 (1975), *NLRB v. Allis Chalmers Manufacturing Co., supra,* 388 U.S. at 179, 87 S.Ct. at 2005, and *National Woodwork Manufacturers Ass'n v. NLRB, supra,* 386 U.S. at 619, 87 S.Ct. at 1254. In doing so, the majority arrives at an interpretation of the act at odds with the Congressional purpose that the publicity proviso would remove pure speech from coverage under the secondary boycott prohibitions.

The majority rests its conclusion on a reading of the word "produced" in the publicity proviso. The publicity proviso, the majority contends, would apply only to publicity about goods "produced" by Hussmann, and in the majority's view it is unreasonable to find that Hussmann is a producer of Pet's other subsidiaries' goods. At 549. First, the majority asserts that the relationship between Hussmann and the other subsidiaries involves only contribution of profit to Pet. *Id.* at 549. Although the majority recognizes that this profit might be employed in productive activities of other subsidiaries, the relation is too attenuated in the majority's view to involve production of other subsidiaries' goods by Hussmann. Secondly, the majority appears to take the view that the Supreme Court in *Servette* confined the meaning of the word "produced" in the publicity proviso to its definition under other labor acts, i. e., ultimately "produced" means "worked on" in some fashion. At 549, *citing Servette, supra,* 377 U.S. at 55–56, 84 S.Ct. at 1104.

The majority's reading of the statute is not compelled by *Servette.* In that case the Supreme Court explained that Congress meant something broader by "produced" than the word means in ordinary usage. The Court suggested that Congress had in the Fair Labor Standards Act likewise used the word "produced" to mean something broader than in ordinary usage. But the Supreme Court in *Servette* did not incorpo-

rate the Fair Labor Standards Act definition to limit or restrict the meaning of the word "produced" under the publicity proviso. Instead, the Court approved a broad interpretation of the publicity proviso to cover any publicity which absent the proviso would be covered by § 8(b)(4)(ii)(B). The Court said it found "no basis" for "incongruous" interpretation of the publicity proviso's language to be "any narrower" than the prohibition on secondary activity of § 8(b)(4)(ii)(B). *Id.* at 56, 84 S.Ct. at 1104.

The Board's broad interpretation of the word "produced" results in coverage of the publicity proviso in harmony with the Congressional purpose. The Board's interpretation also does not involve an unjustifiable reading of the word "produced." The majority, at 549, mischaracterizes the Board's position; the Board did not say that Hussmann's only connection with the other divisions is to contribute profits to Pet. The Board said Hussmann contributed not only profits, but also "goodwill" and "diversification." *See id.* at 549, *citing* the Board's opinion in this case, *United Steelworkers of America*, 244 N.L.R.B. No. 6 (1979). The majority does not say why the Board erred in finding a contribution of goodwill and diversification, or why the Board erred in finding that the goodwill and diversification were at least tangentially a part of the production process of Pet's other divisions. Instead, the opinion asserts—pointing to absolutely no support in the record—that "Should Pet sell Hussmann tomorrow, Pet would manufacture, distribute, and promote its products the same way it is doing now." *Id.* at 549. This assertion simply contradicts the Board's belief that Pet's other divisions would have greater difficulty operating in the absence of the goodwill and diversification and profits contributed by Hussmann. In the end, this is an arguable question, and without demonstrating any particular error in the Board's approach, the majority merely substitutes the opinion of the court for that of the Board.

The majority's approach also infringes upon the Board's responsibilities in a less obvious but more serious way. The Board assumed (without deciding) that § 8(b)(4)(ii)(B) was applicable to the union conduct in this case and reached only the publicity proviso issue. This approach left open the important question whether picketing (or other activity besides pure publicity) directed against Pet subsidiaries other than Hussmann would be secondary activity under § 8(b)(4)(ii)(B). Under the Board's view (and mine), this important question involves the "secondary" nature of activity other than publicity, because it was not Congress' intent to prohibit pure publicity. By ruling the publicity proviso inapplicable to the pure publicity in this case, the majority forces the Board to interpret the coverage of § 8(b)(4)(ii)(B) in a case that does not involve picketing or other activity other than mere speech. In my view, the Board was correct in finding this case an inappropriate one for resolving this important question of labor relations.

The Board avoided deciding whether a union on strike against one division of a "conglomerate" corporation could picket the whole corporation or must confine strike activities to the division. This difficult problem raises fundamental labor relations issues. An employee organization in one division may, as an economic fact, be up against the entire conglomerate. On the other hand, in some circumstances the conglomerate organizational structure may in fact be loose enough that picketing or other action involving the whole conglomerate could be considered in part secondary activity. It is unfortunate that the majority requires resolution of this important question in a case where the dispute remains in the realm of speech; I would leave the Board free in this sensitive area to await a more suitable case involving picketing or other coercive activity with non-speech components.

Ironically enough, the majority may have decided *sub silentio* the issues it remands to the Board. As noted above, the Supreme Court in *Servette* and the legislative history of the publicity proviso compel the conclusion that the publicity proviso applies to *all* pure publicity that would otherwise come under the coverage of § 8(b)(4)(ii)(B). In

other words, mere publicity apart from picketing is covered by the publicity proviso, unless (1) it is not pure publicity in that it involves a threat or the like, or (2) the publicity is not within § 8(b)(4)(ii)(B) because it is not covered secondary activity. No other conclusion is consistent with the *Servette* understanding that the publicity proviso is just as broad as the prohibition on secondary activity. In this case no one claims that the publicity falls outside the realm of pure publicity. Therefore, the publicity falls outside the publicity proviso only if it is not secondary activity covered by the statute. Although the majority derives its conclusion from a reading of the publicity proviso in isolation and remands for a decision on the applicability of the secondary boycott prohibition, in my view the majority has decided that question, because the publicity proviso and the prohibition on secondary activity have the same breadth of coverage. Furthermore, the majority's decision may well also determine that the publicity in this case would not be prohibited if carried out by picketing. That is, if the publicity is not the kind of secondary activity prohibited by § 8(b)(4)(ii)(B), it would not be covered whether carried out by leaflet or picketing.

I do not necessarily disagree with the conclusion that there was no secondary activity in this case. But Congress in the publicity proviso sought to put pure publicity on a different footing than other activity, and this case which involves pure publicity is not appropriate for determining the substantive sweep of § 8(b)(4)(ii)(B). I would deny the petition for review.