**The EDWARD J. DeBARTOLO CORPORATION, Petitioner,**

**The American Retail Federation, The Chamber of Commerce of the United States of America, Amici Curiae,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Florida Gulf Coast Building Trades Council, Intervenor,**

**Building and Construction Trades Department, Amicus Curiae.**

No. 80–1745.

United States Court of Appeals, Fourth Circuit.

Argued June 3, 1981.

Decided Oct. 20, 1981.

Rehearing and Rehearing En Banc Denied Jan. 26, 1982.

Mark E. Levitt, W. Reynolds Allen, Coral Gables, Fla. (Hogg, Allen, Ryce, Norton and Blue, P. A., Coral Gables, Fla., on brief), for petitioner.

Candace Carroll, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Richard B. Bader, Washington, D. C., on brief), for respondent.

Mark F. Kelly, Tampa, Fla. (Richard H. Frank, Frank, Chamblee & Kelly, P. A., Tampa, Fla., on brief), for intervenor The Florida Gulf Coast Building Trades Council.

Lawrence M. Cohen, Lynn E. Gilfillan, Steven L. Gillman, Fox & Grove, Chartered, Chicago, Ill., Stephen A. Bokat, National Chamber Litigation Center, Washington, D. C., on brief, for amicus curiae Chamber of Commerce of the United States of America.

Laurence J. Cohen, Robert D. Kurnick, Sherman, Dunn, Cohen, Leifer & Counts, Washington, D. C., on brief, for amicus curiae The Building and Construction Trades Dept., AFL–CIO.

Jack L. Whitacre, Terry L. Karnaze, Spencer, Fane, Britt & Browne, Kansas City, Mo., on brief, for amicus curiae American Retail Federation.

Before BUTZNER and ERVIN, Circuit Judges, and BRITT,* District Judge.

ERVIN, Circuit Judge:

The Edward J. DeBartolo Corporation (DeBartolo) petitions this court to review and set aside an order of the National Labor Relations Board (the Board) dismissing a complaint alleging that the handbilling activity of the Florida Gulf Coast Building Trades Council, AFL–CIO (the Union) at one of DeBartolo's shopping malls violated federal labor laws. Upon review, we deny the petition.

## I. *Background*

DeBartolo, an Ohio corporation doing business in several states,[1] owns and operates East Lake Square Mall in Tampa, Florida. The mall is fairly large, having over eighty tenants, and it is with one of its larger tenants—the H. J. Wilson Company, Inc. (Wilson's)—that this labor dispute had its origins.

DeBartolo entered into a land lease with Wilson's, whereby Wilson's agreed to build a department store in the mall. Wilson's in turn hired H. J. High Construction Company (High) to construct the store. After construction had commenced, the Union became embroiled in a primary labor dispute with High over the payment of allegedly substandard wages and the provision of inadequate benefits to its employees. In order to publicize its discontent with the situation, the Union handbilled at the entrances to the mall in late 1979 and early 1980, ceasing only after the issuance of an injunction by a Florida state court. The Union passed out the handbills in an orderly manner and did not picket.

The handbills, requesting a total consumer boycott of the mall, read:

PLEASE <u>DON'T SHOP AT EAST LAKE</u> PLEASE

SQUARE MALL

The FLA. GULF COAST BUILDING TRADES COUNCIL, AFL–CIO is requesting that you do not shop at the stores in the East Lake Square Mall because of The Mall ownership's contribution to substandard wages.

The Wilson's Department Store under construction on these premises is being built by contractors who pay substandard wages and fringe benefits. In the past, the Mall's owner, The Edward J. DeBartolo Corporation, has supported labor and our local economy by insuring that the Mall and its stores be built by contractors who pay fair wages and fringe benefits. Now, however, and for no apparent reason, the Mall owners have taken a giant step backwards by permitting our standards to be torn down. The payment of substandard wages not only diminishes the working person's ability to purchase with earned, rather than borrowed, dollars, but it also undercuts the wage standard of the entire community. Since low construction wages at this time of inflation means decreased purchasing power, do the owners of East Lake Mall intend to compensate for the decreased purchasing power of workers of the community by encouraging the stores in East Lake Mall to cut their prices and lower their profits?

---

* The Honorable W. Earl Britt, United States District Judge for the Eastern District of North Carolina, sitting by designation.

1. This court has jurisdiction pursuant to 29 U.S.C. § 160(f), as DeBartolo "transacts business" in Maryland by virtue of the operation of a mall and a shopping center there.

CUT–RATE WAGES ARE NOT FAIR UNLESS MERCHANDISE PRICES ARE ALSO CUT–RATE.

We ask for your support in our protest against substandard wages. Please do not patronize the stores in the East Lake Square Mall until the Mall's owner publicly promises that all construction at the Mall will be done using contractors who pay their employees fair wages and fringe benefits.

IF YOU MUST ENTER THE MALL TO DO BUSINESS, please express to the store managers your concern over substandard wages and your support of our efforts.

We are appealing only to the public—the consumer. We are not seeking to induce any person to cease work or to refuse to make deliveries.

A few days after the Union commenced its handbilling, DeBartolo filed unfair labor practice charges. The Board's General Counsel then issued a complaint alleging that the handbilling urged a secondary boycott in violation of section 8(b)(4)(ii)(B) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(4)(ii)(B), which makes it an unfair labor practice for a labor organization to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, when an object thereof is to force or require any person to cease doing business with any other person. The Union filed a timely response denying commission of an unfair labor practice, and upon joint motion of the parties, a hearing before an Administrative Law Judge was waived, with the Board making findings and conclusions upon a stipulated record.

The Board dismissed the complaint on the ground that the activity came within the ambit of the statute's "publicity proviso," which exempts from the statute's proscription

publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution[.] 29 U.S.C. § 158(b)(4).

Observing that no allegations had been made that the handbilling had the unlawful effect of inducing any individual employed by anyone other than High to refuse to work and concluding that the record established that the handbills were truthful and that the statutory requirement of a "producer-distributor" relationship had been met, the Board determined that the handbilling was protected publicity. On appeal DeBartolo raises three arguments against the Board's conclusions, each of which will be considered in turn.[2]

## II. *Truthfulness of the Handbills*

DeBartolo first argues that the publicity proviso cannot shield the handbilling because one of the prerequisites to its application is that the message conveyed be truthful. The message of the handbills was untruthful, DeBartolo asserts, in three instances: (1) it urged a consumer boycott of all the stores in the mall, including those that were totally neutral; (2) it gave the erroneous impression that High was a "producer" of the products of DeBartolo and the mall's tenants other than Wilson's; and (3) it failed to identify High, the primary employer, by name.

**2.** DeBartolo states in its brief that the Wilson's store has been completed and that High is no longer performing work at this location. We do not, however, consider the case moot. In labor cases, cessation of the challenged conduct does not assure that the underlying controversy will not be reopened or that the challenged conduct will not reoccur. *See NLRB v. Raytheon Co.,* 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970); *Pet, Inc. v. NLRB,* 641 F.2d 545, 545 n.1 (8th Cir. 1981).

These arguments were raised in briefs submitted to the Board, and the Board concluded that the first two contentions addressed legal issues unrelated to the truthfulness requirement and relevant instead to the proviso's "producer-distributor" requirement. We agree and hold our discussion of those issues in abeyance for Part III of the opinion.

The third contention the Board found relevant. It concluded, however, that the Union did not substantially depart from fact or intend to deceive by omitting High's name when it stated that it believed that Wilson's department store was being built by "contractors who pay substandard wages and fringe benefits." In so concluding, the Board relied upon the truthfulness test it had set forth in *Local 537, International Brotherhood of Teamsters (Lohman Sales Co.)*, 132 N.L.R.B. 901, 906 (1961), in which it stated that the publicity proviso "does not require that a handbiller be an insurer that the content of the handbill is 100 per cent correct, and that where . . . there is no evidence of an intent to deceive and there has not been a substantial departure from fact, the requirements of the proviso are met."

The Board correctly applied the *Lohman Sales* standard to the facts of this case. Omission of High's name in the handbill is, standing alone, not evidence of an intent on the Union's part to deceive the public about the labor dispute and does not, in any sense, depart from fact. Indeed, to hold otherwise would be tantamount to imposition of a per se requirement that the name or names of primary employer or employers appear in the handbills. This we will not do, in light of the Board's reluctance to make the statutory truthfulness requirement more stringent than its current expression in *Lohman Sales* and the dubious benefits to the public

of such a rule. We therefore uphold the Board's conclusion that the handbill's message was a truthful one.[3]

### III.  *Producer-Distributor Relationship*

■ The second argument advanced by DeBartolo is that the publicity proviso did not protect the handbilling because the producer-distributor relationship required by the proviso did not exist between High and DeBartolo, and DeBartolo and the mall's tenants; it asserts that only the relationship between High and Wilson's can qualify as one between a producer and a distributor. We disagree and uphold the Board's conclusion that this relational requirement was fulfilled.

The proviso protects truthful publicity that advises the public "that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer." In considering the proviso's producer-distributor requirement in the context of this case, the Board first traced the mutually beneficial relationship between, and interdependence of, DeBartolo and the mall's tenants, as evidenced by the terms of their lease agreements. It found that each tenant agreed to use its premises in a way that would not injure the mall's reputation or interfere with other tenants' businesses; that each tenant had to pay its share of the operating, maintenance, and repair costs for the mall's common areas, with its share to be reduced every time a new tenant moved in; that a tenant's minimum rent would increase by ten per cent when new department stores of certain size opened at the mall; that each tenant was required to join the mall's merchants' association and to take part in joint advertising projects; that DeBartolo would share in the commercial success of the mall by collecting from ten-

**3.** Board Member Penello dissented from the Board's decision in this case because he found the stipulated record to be an insufficient basis upon which to decide the question of the handbill's truthfulness. He would have remanded the proceeding for a hearing on what he perceived to be factual questions surrounding the truthfulness issue.

We think that the Board majority acted properly in determining the issue. Application of the *Lohman Sales* test in this case required only legal determinations, i. e., whether omission of High's name from the handbill was evidence of intent to deceive, and whether the omission represented a substantial departure from fact. Remand was therefore not necessary.

ants percentage rents based on sales; and that DeBartolo had the right to exercise · control over tenants' construction work, business hours, employees, signs, and equipment.

The terms of the lease agreements, in the Board's judgment, reflected "the symbiotic nature of the relationship between DeBartolo and its tenants." The symbiosis, in turn, supported the Board's conclusion that not only the High-Wilson's relationship but also the High-DeBartolo relationship and the relationship between High and the mall's tenants could be described as that of producer and distributor.

The Board concluded that High is a producer of the Wilson's store at the mall because, by its employees' labor, it adds value to the store. High is also a producer of the mall enterprise itself because, by helping to build the Wilson's store, it has applied capital, enterprise, and service to the mall enterprise and has thus added value to that enterprise. Both the Wilson's store and the mall enterprise itself, therefore, are products of High's labor.

Although the Board does not elaborate, its reasoning suggests that it considered DeBartolo and the mall's tenants to be distributors of both of High's products. DeBartolo and the tenants help "distribute" the new Wilson's store and its inventory by attracting shoppers, helping to maintain common areas, and participating in joint advertising. They help "distribute" the mall enterprise and the goods sold through that enterprise simply by conducting business.

■ In reviewing the Board's resolution of the producer-distributor issue, which presents mixed questions of law and fact, we are mindful of the limitations upon that review; we are to "accord great respect to the expertise of the Board when its conclusions [on a mixed question of fact and law] are rationally based on articulated facts and consistent with the Act." *NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980). The Board's construction of a labor statute, if reasonably defensible, moreover, should not be

rejected merely because the courts might prefer another view of the statute. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979), citing *NLRB v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). Indeed, that construction is entitled to considerable deference. *NLRB v. Local Union No. 103, International Association of Bridge, Structural and Iron Workers*, 434 U.S. at 350, 98 S.Ct. at 660. With these cautionary instructions in mind, we conclude that the Board's reasoned conclusions on the meaning and application of the producer-distributor language are rational and consistent with the proviso language. *See NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).

Board and judicial interpretation of the producer-distributor language, based in large part upon the legislative history of the proviso, clearly indicates that the language is not to be read literally but instead is to be broadly construed. In its leading decision *Lohman Sales*, the Board concluded that a wholesale distributor of cigarettes and other commodities—a middleman—was a producer of those goods within the meaning of the proviso because it added the value of its labor to these goods in the form of capital, enterprise, and service. In reaching that conclusion, the Board reviewed the legislative history of the proviso and decided that the words "product" and "produced" were not meant to be words of special limitation. Rather, it concluded that labor is the key characteristic of one who produces and, accordingly, that the Board need not attempt "to draw an uncertain line between those employers engaged essentially or only incidentally in the fabrication of products; between those employers who create a new product or embellish an old one; between products of the imagination and those that can be seen, touched, or smelled." 132 N.L.R.B. at 907. *See Local No. 662, Radio and Television Engineers (Middle South Broadcasting Co.)*, 133 N.L.R.B. 1698 (1961) (radio station is producer of products it advertises).

The Supreme Court approved the *Lohman Sales* decision and rationale in *NLRB v. Servette, Inc.*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). The *Servette* Court reviewed the legislative history of the proviso and the Board's *Lohman Sales* decision and concluded that Servette, as a wholesale distributor of specialty merchandise stocked by food chains, was a producer of that merchandise for purposes of application of the publicity proviso. In so holding, the Court noted that

> [t]he proviso was the outgrowth of a profound Senate concern that the unions' freedom to appeal to the public for support of their case be adequately safeguarded.... It would fall far short of achieving this basic purpose if the proviso applied only in situations where the union's labor dispute is with the manufacturer or processor.... There is nothing in the legislative history which suggests that the protection of the proviso was intended to be any narrower in coverage than the prohibition to which it is an exception, and we see no basis for attributing such an incongruous purpose to Congress. *Id.* 377 U.S. at 55, 84 S.Ct. at 1104.[4]

Other courts have applied the *Servette* rationale to give the proviso a similarly expansive scope. *See, e. g., Great Western Broadcasting Corp. v. NLRB*, 356 F.2d 434 (9th Cir. 1966) (television station, by virtue of its advertisement of goods and services, was a producer of those goods and services, even though court found incongruous the idea of a service being a product which is distributed).

These decisions—handed down soon after the 1959 passage of the proviso—quite clearly show that the proviso's producer-distributor language was not to be given a narrow or literal construction, for such an interpretation would often defeat its clear purpose of protecting labor's ability to publicize by means other than picketing its grievances to consumers. Economic realities made a broad reading necessary; employees work not only to produce tangible products but also to provide services and to add value to goods not directly produced by them.

In no area has a generous interpretation of the language been more necessary than in the construction industry, as a construction company obviously does not produce tangible goods that are then literally distributed by a secondary employer. The Board has, accordingly, given liberal interpretation to the proviso in this context and has consistently held that construction contractors and subcontractors are producers within the meaning of the proviso and that their services are products, *see Plumbers and Pipefitters Local Union No. 142 (ShopRite Foods, Inc.)*, 133 N.L.R.B. 307 (1961); *Local 712, IBEW (Golden Dawn Foods)*, 134 N.L.R.B. 812 (1961), and that they are also producers of the "end product" to which their services contribute. *See Local 73, Electrical Workers Union (Northwestern Construction of Washington, Inc.)*, 134 N.L.R.B. 498 (1961).[5]

**4.** As the Court made clear in *Servette* and in the companion case *NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760 (Tree Fruits)*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the publicity proviso resulted from a compromise between the House of Representatives and the Senate in amending section 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4), in 1959. The proviso was incorporated into the statute, even though it protected some coercive activity, because of the Senate's concern that the right of unions to exercise free speech and to appeal to the public be protected and that the revised section 8(b)(4) not offend the first amendment. When the Senate passed the compromise bill, Senator John Kennedy, who had presided over the conference committee, stated that the proviso preserved

the right to appeal to consumers by methods other than picketing asking them to refrain from buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods.

... We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop ... and carry on all publicity short of having ambulatory picketing.... 105 Cong.Rec. 17898–99 (1959).

**5.** In a different procedural setting, a district court has reasoned in like manner and refused to enjoin handbilling by a union at a retail store

As labor cases involving shopping center construction arose, the Board continued to give broad definition to the producer-distributor language of the proviso. In *Local Union No. 54, Sheet Metal Workers (Sakowitz, Inc.)*, 174 N.L.R.B. 362 (1969), the Board held that a union's handbilling of certain downtown stores was protected under the proviso. The handbills asked for a consumer boycott of those stores because the heating and air conditioning subcontractor at a suburban shopping center at which the stores had leased space was paying substandard wages. The Board's conclusion allowed the stores to be handbilled even though they themselves had not hired the subcontractor and had no relationship with it except to pay for its services as part of their monthly rent. In *Nashville Building & Construction Trades Council (Castner-Knott Dry Goods Store)*, 188 N.L.R.B. 470 (1971), the Board reasoned in similar fashion. In that case, simultaneous picketing and handbilling at a downtown store urging a consumer boycott because of that store's contract with an out-of-state nonunion construction company to build a new store for it at a shopping mall was held to be illegal secondary activity. Handbills had been earlier distributed at that store and others which planned to locate at the mall, however, requesting that consumers boycott those stores because the mall's owner had hired nonunion contractors to construct the mall, and no argument was made that those handbills were outside the scope of the proviso. In these shopping center cases it can be inferred that the construction contractors and subcontractors were producers of a certain work product and that the shopping center's stores were distributors of that product and thus could be handbilled by unions urging a total boycott of their businesses.

In light of precedent, the Board's interpretation and application in this case of the publicity proviso is clearly consistent with the Act and is rational. High produces certain products, i. e., the Wilson's store and the mall enterprise, and those products are in turn distributed by DeBartolo and the mall tenants, all of whom had a financial interest in High's work but had no direct relationship with High. That DeBartolo and the mall tenants are not involved in the primary dispute between High and Wilson's does not alter the conclusion: it was clearly Congress's intent to allow coercive pressure of neutral employers in the forms of union handbilling of consumers and other pure publicity. *See NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760*, 377 U.S. at 69–70, 84 S.Ct. at 1069–70. Furthermore, that High had no contract with either DeBartolo or the mall tenants is not of major significance; the handbilling should be protected under the publicity proviso even when there is no direct connection between the primary employer and the handbilled employer. *See, e. g., Local Union No. 54, Sheet Metal Workers (Sakowitz, Inc.)*, 174 N.L.R.B. 362 (1969). High thus does not have to be contractually related to DeBartolo and the mall's tenants for DeBartolo and the tenants to be able to respond to union handbilling and, in turn, to apply pressure on Wilson's and High. We therefore uphold the Board's conclusion that the proviso's requirement of a producer-distributor relationship was met in this case.[6]

owned by persons who had a financial interest in a construction project at which employees allegedly worked under substandard conditions. *Squillacote v. Building and Construction Trades Council*, 266 F.Supp. 971 (E.D.Wis. 1967).

**6.** The Board's appellate counsel, intervenor Florida Gulf Coast Building Trades Council, and amicus Building and Construction Trades Department also argue for affirmance of the Board's dismissal of the complaint on first amendment grounds, that is, that the dismissal

successfully avoids a first amendment conflict, or, alternatively, that the first amendment protects the handbilling. The Board, however, found it unnecessary to reach or pass upon the first amendment question, and, because the issue has not been addressed by the Board, we decline to do so. We cannot substitute Board counsel's rationale for that of the Board, *NLRB v. Food Store Employees Union, Local 347*, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), because substitution of counsel's rationale or the court's own discretion for that of the Board threatens the integrity of the administrative

The Eighth Circuit in *Pet, Inc. v. NLRB*, 641 F.2d 545 (1981), has construed the producer-distributor requirement of the publicity proviso in a rather different fashion. In that case, the court reversed the Board's dismissal of Pet's complaint alleging that the United Steelworkers had engaged in an illegal secondary boycott. The union had struck one of the plants of Hussmann, a wholly owned subsidiary of Pet, and had also run advertisements in local newspapers and had handbilled in the St. Louis area urging the public to boycott Pet products and other Pet subsidiaries. The Board concluded that the union's handbilling and advertising activities were protected by the publicity proviso, because Hussmann, by its application of capital, enterprise, and service to Pet and to Pet's diversified enterprise, was a producer of all Pet enterprise products, in that the income it generated, goodwill it earned, and diversification it provided inured to the benefit of the entire enterprise. *United Steelworkers of America (Pet, Inc.)*, 244 N.L.R.B. No. 6 (1979). The Eighth Circuit majority, however, concluded that the proviso did not cover the union's publicity because Hussmann could not be a producer of the products of Pet and its subsidiaries: Hussmann did not, within the normal meaning of the word "produce," produce Pet's products by benefit of its profits; it had only a highly attenuated connection with Pet's products; and it did not work on any of the Pet products. 641 F.2d at 549. The dissent in *Pet*, however, concluded upon review of the proviso's legislative history and statutory purpose that the Board's broad interpretation of the producer language of the proviso was in harmony with the congressional purpose of protecting all pure publicity by a union. It therefore would have denied Pet's petition for review.

The Board in the case at hand relied in part upon its reasoning in *Pet* in concluding that the handbilling fell within the scope of the publicity proviso.[7] To the extent that the Board's reasoning in that decision supports the conclusions reached in our case, we respectfully differ with the reasoning and conclusions of the Eighth Circuit majority in *Pet* and find more persuasive the reasoning of the dissent.

Our considered judgment is that the Board in the case before us correctly concluded that the proviso applied to the handbilling at the mall and that High is a producer, and DeBartolo and the tenants, distributors, within the meaning of the proviso.

#### IV. *Location of the Handbilling*

■ DeBartolo finally argues that, even if the publicity proviso covers the language of the handbill, the activity of handbilling on the mall premises violated the Act. This issue of the location of the handbilling appears to have been raised for the first time on appeal; the Board's decision makes no mention of this argument in its summaries of the parties' contentions, and it does not in any manner address or determine the issue. We therefore decline to consider it, in light of the command of section 10(e) of the Act that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Finding no extraordinary circumstances to excuse DeBartolo, we cannot consider the argument. *See NLRB v. Kotarides Baking Co., Inc.*, 340 F.2d 587 (4th Cir. 1965); *NLRB v. Community Motor Bus Co.*, 335 F.2d 120 (4th Cir. 1964).

#### V.

Perceiving no merit in DeBartolo's contentions concerning the truthfulness of the handbills or the fulfillment of the publicity

---

process and is incompatible with the orderly function of the process of judicial review. *NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). *See SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

7. The Eighth Circuit had not denied enforcement of the Board's order in *Pet* at the time the Board decided this case.

proviso's requirements of a producer-distributor relationship, we deny DeBartolo's petition to set aside the Board's order.

PETITION DENIED.

BRITT, District Judge, dissenting:

This matter was presented to the National Labor Relations Board upon stipulated facts, including the following:

At all times material herein, East Lake Square Mall, located in Tampa, Florida, has been an operating shopping center mall, owned and operated by DeBartolo through its subsidiary, Eastlake Square Associates. At no time germane to this Complaint has DeBartolo operated a retail store at East Lake Square Mall, nor does DeBartolo own any of the property on which the Belk's is located. East Lake Square Mall has approximately 85 tenant employers which, at all times material herein, have leased space in which to operate their respective stores from DeBartolo.... Wilson's is a tenant of DeBartolo while Belk's is not. DeBartolo has no control over the method or means by which any tenant or Belk's operates its business, except as provided in the applicable lease, property, or maintenance agreement. Neither does any tenant or Belk's have any control over the method or means by which DeBartolo or any other tenant or Belk's does business. Method or means as used herein and hereinafter includes, but is not limited to wages, hours, as well as working conditions and other matters dealing with labor relations....

DeBartolo, through its subsidiary, Eastlake Square Associates, has entered into a land lease with Wilson's, whereby Wilson's will build a department store that will connect to, and become part of the already operating East Lake Square Mall. Pursuant to the terms of the lease, Wilson's is totally responsible for the construction of its store and will own the structure.... Wilson's has contracted with High, a general contractor, to build its department store. High has employed its own employees, as well as contracted with various sub-contractors to build Wilson's Department Store. High is not a tenant of DeBartolo, does not engage in the operation of retail stores and does not have a contract to lease or purchase any property in or adjacent to the East Lake Square Mall....

. . . .

Neither DeBartolo, nor any tenant other than Wilson's, nor Belk's, has any contract or business relationship of any type with High. No tenant nor Belk's has any contract or business relationship with Wilson's.

. . . .

The handbilling took place at all four entrances to the Mall which ... are all located on the private property of DeBartolo but are utilized as means of ingress and egress to the retail stores located in the Mall.

. . . .

If it were not for the fact that High was and is performing construction work on the Wilson's store, Respondent would have no dispute with DeBartolo, Belk's or any tenant in the Mall and would have no cause to handbill at East Lake Square Mall.

At all times material herein Belk's has maintained and operated a retail establishment within Hillsborough County, Florida, which is more particularly located at East Lake Square Mall. That retail establishment is located on land which Belk's owns. That land is comprised of approximately 10.72 acres of property within a larger parcel of property otherwise known as East Lake Square Mall. The property owned by Belk's includes the land upon which the store structure stands and the adjacent sidewalks and parking area.

The Wilson's and Belk's retail stores are competitor establishments. Belk's has no business relationship with Wilson's in any manner, and exercises no control over the construction of the Wilson's store to be located at East Lake Square Mall.

Belk's has no contract with nor does it do business in any manner with High.

The only business relationship between Belk's and DeBartolo is that Belk's pays DeBartolo for maintenance and security of common areas. Belk's does not in any way share or split its revenues from its East Lake Square Mall store with DeBartolo. Belk's pays no money or thing of value to any tenant in the Mall and has no business relationship with any of them, except as provided in any provision of the aforesaid lease, property, or maintenance agreements.

Between the dates of January 8, 1980, and January 17, 1980, Respondent Union handbilled at the entrances to Belk's retail store with the identical handbill to that previously distributed at the mall entrances. The handbilling took place at the three entrances to the store itself, all of which took place upon Belk's property. . . .

Neither DeBartolo, Belk's nor any tenant has the ability to remove High as the general contractor on the construction project of the Wilson's store at East Lake Square Mall.

Under these facts the majority concludes that "High is a producer, and DeBartolo and the tenants, distributors" within the meaning of the publicity proviso of the statute under consideration. 29 U.S.C. § 158(b)(4). Being unable to agree, I respectfully dissent.

A key element of the proviso is that the publicity must relate to a "product" which has been "produced *by an employer with whom the labor organization has a primary dispute.*" *Id.* (emphasis added).

It is undisputed that as to Wilson the handbilling was proper. However, it requires a strained construction of the statute to say that the "mall enterprise itself" is the "product" of High's labor and that the mall owner and tenants distribute that enterprise "simply by conducting business." In my view no case has gone this far. The cases relied on by the majority are factually distinguishable. In one of these, *N.L.R.B. v. Servette, Inc.*, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), Respondent Servette was a wholesale distributor of certain items

carried for sale by various retailers. The Union, involved in a dispute with Servette, distributed handbills at the retail stores asking patrons of the stores not to buy certain listed products distributed by Servette. The Supreme Court held that products "produced by an employer" included those distributed by a wholesaler such as Servette.

In *Pet, Inc. v. N. L. R. B.*, 641 F.2d 545 (8th Cir. 1981), the Eighth Circuit reversed a decision of the Board that one of Pet's wholly-owned subsidiaries (Hussmann) was a "producer" of Pet's products. I agree with the majority there, which said: ". . . we think it totally at odds with any normal interpretation of the word 'produce' to say that because Hussmann's profits inure to the benefit of Pet, Hussmann produces Pet's products. We find the connection between Pet's products and Hussmann to be highly attenuated." *Id.* at 549.

Whether the handbilling is an unfair labor practice under Section 8(b)(4)(ii)(B) of the Act or whether, as contended by Respondent, it is free speech protected by the first amendment, are matters not addressed by the Board. My vote is to reverse and remand to the Board for consideration of those important and dispositive issues.